Jason J. STOUT, Respondent,

v.

AMCO INSURANCE COMPANY,
Petitioner, Appellant,

Andrew Pangrac et al., Defendants.

No. CX–01–246.

Supreme Court of Minnesota.

June 13, 2002.

Rehearing Denied July 12, 2002.

George C. Hottinger, Erstad & Riemer, P.A., Minneapolis, MN, for appellant.

Steven R. Peloquin, Peloquin & Minge, P.A., New York Mills, MN, for respondent.

## OPINION

LANCASTER, Justice.

Jason Stout sustained injuries to his knees when a car insured by AMCO Insurance Company hit him. Stout was billed $25,638.73 by medical service providers for the treatment of his injuries. The amount billed was discounted pursuant to Medicaid and MinnesotaCare fee schedules, leaving a balance of $12,471.44. The parties agree that, under the Minnesota No-Fault Automobile Insurance Act, Minn.Stat. §§ 65B.41–.71 (2000), AMCO must reimburse Stout's loss. The sole issue on appeal is whether Stout's loss is equal to the amount originally billed or the post-discount balance. The district court and the court of appeals concluded that Stout was entitled to the amount originally billed. We affirm.

## I.

Stout was hit by a car in July 1993, as he walked near a gas station in Wadena, Minnesota. Stout's legs were pinned between the car's front bumper and a metal guardrail, causing injuries to both of his knees. At the time of the accident, Stout did not have health insurance. He later applied for and received medical assistance benefits from the Department of Human Services (DHS) in the form of Medicaid and MinnesotaCare. The car that struck Stout was insured by AMCO. The limit of medical expense loss payable under AMCO's no-fault automobile insurance policy was $20,000.

In a letter dated April 25, 1995, Stout notified the car owner of his claims arising from the accident. AMCO was placed on notice of Stout's claims in late April or early May 1995, when it received a copy of Stout's letter. In May 1995, Stout submitted an application for no-fault benefits to AMCO. AMCO denied Stout's claim for benefits in November 1995, on the grounds that Stout's injuries were the result of an intentional act by the driver of the car rather than an accident,[1] and that the car was not being used for transportation purposes when the accident occurred.[2]

In February 1996, DHS notified AMCO that it had paid medical assistance benefits on Stout's behalf. DHS also filed a lien in

---

1. The no-fault automobile insurance policy's definition of "eligible insured person" included pedestrians sustaining bodily injury as a result of an "accident" involving the insured motor vehicle.

2. Under the Act, an injured person is entitled to basic economic loss benefits for loss suffered through "injury arising out of the maintenance or use of a motor vehicle." Minn. Stat. § 65B.44, subd. 1 (1998). In determining whether an accident arises out of the maintenance or use of a motor vehicle, we have stated that one of the factors to consider is whether the vehicle was being used for transportation purposes. *Cont'l W. Ins. Co. v. Klug*, 415 N.W.2d 876, 878 (Minn.1987); *Classified Ins. Corp. v. Vodinelich*, 368 N.W.2d 921, 923 (Minn.1985).

the amount of $1,054.90, the amount it had paid to Stout's medical service providers up to that point, against any person or entity liable for damages arising out of the accident.

AMCO commenced a declaratory judgment action seeking confirmation of its denial of coverage. In July 1998, the district court entered an order granting judgment in favor of Stout and requiring AMCO to provide Stout "with all no-fault benefits to which he may be entitled." AMCO appealed the district court's order and the court of appeals affirmed.

In February 1999, while AMCO's appeal of the district court's order was pending in the court of appeals, Stout commenced the present action against AMCO to recover basic economic loss benefits and statutory interest under AMCO's no-fault automobile insurance policy and the Act.[3] Approximately nine months later, Stout underwent arthroscopic surgery on his left knee. Prior to this surgery, most of Stout's medical treatment had been directed toward his right knee. AMCO, acting on the expert opinion of an orthopedic surgeon it hired to review Stout's medical records, took the position that the injury to Stout's right knee was caused by the accident, but the injury to his left knee was not.

In July 2000, AMCO issued a check to Stout in the amount of $4,831.27. The parties agree that this payment covered all of the medical expenses paid by the DHS and Stout for the treatment of Stout's right knee. It did not, however, cover the difference between the amount billed and the post-discount amount paid for the treatment of Stout's right knee, nor did it cover any of the medical expenses, either billed or paid, for the treatment of his left knee.

The next month, a jury trial was held on the factual issue of whether the accident was the cause of the injuries to Stout's left knee. The jury returned a special verdict in the affirmative. The remaining issues in the case, including the amount of Stout's loss, were submitted to the district court for decision. Stout argued that his loss was equal to the amount originally billed by the medical service providers. AMCO disagreed, arguing that the amount originally billed overstated Stout's loss by ignoring the discounts his health insurer obtained pursuant to Medicaid and MinnesotaCare fee schedules.

The district court found that the amount billed for the treatment of Stout's right knee was $9,184.90, and that the amount billed for the treatment of his left knee was $16,453.83. Thus, the total amount billed for the treatment of Stout's knees was $25,638.73. The amount billed was ultimately discounted by $13,167.29 pursuant to Medicaid and MinnesotaCare fee schedules, leaving a balance of $12,471.44. Stout's health insurer paid $5,328.72 of this balance, and Stout paid $2,627.72. The remaining balance of $4,515 had not been paid as of the date of the district court's order.

The district court concluded that Stout was entitled under the Act to the amount originally billed, subject only to the $20,000 coverage limit on medical expenses payable under AMCO's no-fault automobile insurance policy. The district court ordered AMCO to reimburse Stout's medical expense loss in the amount of $15,168.73. This amount was calculated by subtracting AMCO's July 2000 payment of $4,831.27 from the policy's $20,000 coverage limit. The district court gave three

---

**3.** Stout's complaint also named the driver of the car and the owner of the car as defen- dants.

reasons for its conclusion. First, it noted that AMCO's failure to promptly reimburse Stout violated one of the "primary purposes" of the Act, "to encourage prompt payment by the insurer of medical expenses * * * to individuals who are injured in automobile accidents so as to relieve the economic distress otherwise experienced by [those] individuals."

Second, the district court cited Minn. Stat. § 65B.54, subd. 1 (2000), which provides that "[b]asic economic loss benefits are payable monthly as loss accrues. Loss accrues * * * as * * * medical * * * expense is incurred." The district court concluded that, under the plain language of this section, the "amount or dollar value of the medical expense which is incurred by a patient is the amount reflected in the medical service provider's initial billing statement, not the amount which the service provider might ultimately decide to accept in payment of the bill."

Third, the district court relied on *Wallace v. Tri–State Insurance Co.*, 302 N.W.2d 337, 339–40 (Minn.1980), and *Hoeschen v. Mutual Service Casualty Insurance Co.*, 359 N.W.2d 677, 680 (Minn. App.1984), *rev. denied* (Minn. Mar. 6, 1985), for the proposition that a no-fault insurer cannot reduce the amount of benefits payable to an insured based on payments made by other parties. Applying *Wallace* and *Hoeschen* to the facts of this case, the district court stated:

> AMCO cannot fairly use amounts paid or reductions obtained by Medicaid or Minnesota Care in determining the amount of benefits which it has an obligation to pay. The windfall, if there is one, goes to the injured person to whom or for whom the benefits were supposed to be paid in the first place.

AMCO appealed and the court of appeals affirmed. AMCO argued that the district court erred by equating Stout's loss with the amount originally billed and that Stout did not have standing to recover the amount of the discounts. The court of appeals rejected AMCO's first argument for the same reasons articulated by the district court. The court of appeals also rejected AMCO's standing argument, reasoning that Stout had a personal stake in recovering all benefits to which he was entitled under the Act.

In March 2001, AMCO issued a second check to Stout. The check covered the post-discount amount paid by the DHS and Stout for the treatment of Stout's left knee. The check also covered the $4,515 outstanding balance. Thus, AMCO has reimbursed Stout for all post-discount amounts paid for Stout's medical treatment. AMCO has not, however, reimbursed Stout for the amount of the discounts.

## II.

■ There is no dispute that the Act grants Stout a right to recover basic economic loss benefits, *see* Minn.Stat. § 65B.46, subd. 1 (2000),[4] and that, as the no-fault insurer of the car that hit Stout, AMCO is the proper source of those benefits, *see* Minn.Stat. § 65B.47, subd. 4(c) (2000).[5] The function of basic economic loss benefits is to reimburse the injured

---

4. Section 65B.46, subd. 1, states that "[i]f the accident causing injury occurs in this state, every person suffering loss from injury arising out of maintenance or use of a motor vehicle * * * has a right to basic economic loss benefits."

5. Section 65B.47, subd. 4(c), states that "[t]he security for payment of basic economic loss benefits applicable to injury to a person not otherwise covered [by a plan of reparation security] who is not the driver or other occupant of an involved motor vehicle is the security covering any involved motor vehicle."

person "for all loss suffered through injury arising out of the maintenance or use of a motor vehicle." Minn.Stat. § 65B.44, subd. 1 (1998). Thus, Stout is entitled to basic economic loss benefits only to the extent that he has suffered a "loss." According to Stout, his loss is $25,638.73, the amount originally billed by his medical service providers for the treatment of his injuries. In response, AMCO argues that Stout's loss is $12,471.44, the amount actually paid in full satisfaction of Stout's medical bills. The difference between the figures offered by the parties is $13,167.29, which represents the amount by which Stout's medical bills were discounted pursuant to Medicaid and MinnesotaCare fee schedules. The narrow legal issue presented by this case, then, is whether the discounts obtained by Stout's health insurer are included in the amount of Stout's loss.

■ To decide this issue, we must interpret and apply the relevant provisions of the Act. Statutory interpretation is a question of law subject to de novo review. *Burkstrand v. Burkstrand,* 632 N.W.2d 206, 209 (Minn.2001); *Whetstone v. Hossfeld Mfg. Co.,* 457 N.W.2d 380, 382 (Minn. 1990). Similarly, we are not bound by the lower courts' conclusions in applying a statute to undisputed essential facts. *Watson v. United Servs. Auto. Ass'n,* 566 N.W.2d 683, 688 (Minn.1997); *Meister v. W. Nat'l Mut. Ins. Co.,* 479 N.W.2d 372, 376 (Minn.1992).

In general terms, the Act is a comprehensive and highly-detailed statutory scheme that governs the compensation of persons injured in automobile accidents. The Act is silent as to whether the amount of loss suffered by an injured person excludes the discounts that health insurers are able to obtain from medical service providers. It appears to us that such discounts have become common, and the leg-

islature may decide that this area of the law would benefit from its attention. In the meantime, we must decide the issue based on the provisions of the Act that set forth the nature of basic economic loss benefits and describe the concept of loss.

■ With the sole exception of workers' compensation benefits, basic economic loss benefits are primary with respect to any other benefits "which any person receives or is entitled to receive from any other source as a result of injury arising out of the maintenance or use of a motor vehicle." Minn.Stat. § 65B.61, subd. 1 (2000). To preserve no-fault insurers' status as the primary source of benefits for those injured in automobile accidents, the Act generally prohibits no-fault insurers from coordinating basic economic loss benefits with benefits provided by any other legal entity. *Id.,* subd. 3. In other words, a no-fault insurer has a duty to provide basic economic loss benefits to reimburse an injured person's loss even when the injured person is entitled to compensation for the same loss from a different source.

Again, the amount of basic economic loss benefits to which Stout is entitled depends on the loss he suffered. Minn.Stat. § 65B.44, subd. 1. The Act defines the term "loss" as "economic detriment resulting from the accident causing the injury, consisting only of," among other things, "medical expense." Minn.Stat. § 65B.43, subd. 7 (2000). The Act further provides that "[l]oss accrues not when injury occurs, but as * * * medical * * * expense is incurred." Minn.Stat. § 65B.54, subd. 1.

Under section 65B.54, subd. 1, the amount of the loss that accrued to Stout is equal to the medical expense he incurred. Our decision in *Collins v. Farmers Insurance Exchange,* 271 Minn. 239, 135 N.W.2d 503 (1965), is instructive on the question of how to calculate the medical expense incurred by Stout in this case. *Collins* in-

volved an action by the insured to recover medical expenses under an automobile liability insurance policy that provided up to $5,000 of coverage for " 'reasonable [medical] expenses actually incurred.' " *Id.* at 240–41, 135 N.W.2d at 504–05. The insured's medical service providers billed him in excess of $5,000. *Id.* at 241, 135 N.W.2d at 505. After the insurer denied the insured's claim, the amount billed was reduced to $2,250 as part of a settlement agreement between the insured and his medical service providers. *Id.,* 135 N.W.2d at 505. The insurer asserted that the expense incurred was the amount actually paid by the insured pursuant to the settlement, rather than the amount that was originally billed. *Id.* at 244, 135 N.W.2d at 507. We stated that the "well[-]fixed and delineated" definition of "incur" is " 'to become liable for,' as distinguished from actually 'pay for.' " *Id.,* 135 N.W.2d at 507; *see Schmitt v. Emery,* 215 Minn. 288, 292, 9 N.W.2d 777, 780 (1943) (stating that "to incur an expense means to become liable therefor or subject thereto"). Applying this definition, we rejected the insurer's argument and held that the insured became liable for, and therefore incurred, the amount originally billed, and "not the amount he paid as a result of a collateral transaction." *Collins,* 271 Minn. at 244, 135 N.W.2d at 507.

Like the insurer in *Collins,* AMCO argues that the medical expense incurred by Stout is limited to the amount actually paid in satisfaction of his medical bills. As demonstrated in *Collins,* however, an injured person incurs medical expense as he or she receives bills for medical treatment. *See id.,* 135 N.W.2d at 507. A reduction in the amount billed, whether obtained pursuant to a settlement agreement or a health insurer's fee schedule, does not modify the

amount of medical expense incurred.[6] We therefore conclude that the medical expense incurred by Stout is the full amount reflected on his medical bills, and not the amount that was paid in satisfaction of those bills as the result of collateral transactions involving Stout's health insurer. *See id.,* 135 N.W.2d at 507. Thus, the amount of the loss that accrued to Stout is $25,638.73.

■ Having calculated the loss that accrued to Stout, we next address AMCO's argument that the discounts obtained by Stout's health insurer decreased the amount of his loss. We begin by noting that there is no language in the Act providing that loss, once accrued, can be reduced through the involvement of the injured person's health insurer. In addition, reducing Stout's loss on the basis of discounts obtained by his health insurer would be inconsistent with the Act's designation of basic economic loss benefits as primary and would violate the Act's prohibition of the coordination of benefits. *See* Minn.Stat. § 65B.61, subds. 1, 3 (2000). We held in *Wallace* that a no-fault insurer impermissibly coordinates benefits when it refuses to pay medical bills that have already been paid by the injured person's health insurer. 302 N.W.2d at 338–40. AMCO maintains that *Wallace* is not controlling because the amount at issue in this case was discounted, rather than paid.

AMCO's interpretation of both section 65B.61, subd. 3, and *Wallace* focuses on the form of the transaction between the injured person's health insurer and the medical service provider. If a health insurer reduces an injured person's medical bills by paying the provider, then a no-fault insurer cannot reduce the benefits payable to the injured person without run-

---

6. Of course this rule would not apply if the amount reflected on the bill was unreasonable or the result of an error by the medical service provider.

ning afoul of the Act. According to AMCO, if the bills are reduced by any other means, however, then a no-fault insurer would be permitted to reduce the benefits payable to the injured person. Although the forms of the two transactions may differ, we find it more important that, from the standpoint of the no-fault insurer, their substance is the same. In either case, the no-fault insurer attempts to reduce its obligation to provide basic economic loss benefits on the ground that another source of benefits has stepped in and decreased the amount of the injured person's medical bills—whether by paying them, obtaining discounts, or some other means. Thus, we are not persuaded that the distinction between this case and *Wallace* is a meaningful one, and we therefore conclude that AMCO's failure to reimburse Stout for the discounted portions of his medical bills violates section 65B.61, subd. 3.

Our holding on this point effectuates the Act's purpose of ensuring prompt payment of benefits to those injured in automobile accidents. Minnesota Statutes § 65B.42(1) (2000) states that one of the purposes of the Act is

> [t]o relieve the severe economic distress of uncompensated victims of automobile accidents within this state by requiring automobile insurers to offer and automobile owners to maintain automobile insurance policies * * * which will provide prompt payment of specified basic economic loss benefits to victims of automobile accidents without regard to whose fault caused the accident.

Similarly, section 65B.42(3) states that another purpose of the Act is "[t]o encourage appropriate medical and rehabilitation treatment of the automobile accident victim by assuring prompt payment for such treatment." By holding that Stout is entitled to the full amount reflected on his medical bills, we remove the incentive for no-fault insurers to delay the payment of meritorious claims in the hope that the injured person's health insurer will step in and pay his or her medical bills at a discounted rate. Although the Act contains a provision adding 15% per year to all overdue payments, Minn.Stat. § 65B.54, subd. 2 (2000), this provision, by itself, would do little to deter a no-fault insurer from delaying payment when, as here, the amount of the discounts is greater than 15% of the remaining balance.

AMCO's no-fault insurance policy limits coverage for medical expense loss to $20,000. Because Stout's medical expense loss is $25,638.73, AMCO must provide basic economic loss benefits to Stout up to the policy limit of $20,000. Given that Stout's medical service providers accepted $12,471.44 in full satisfaction of their claims, the remaining $7,528.56 of basic economic loss benefits will go directly to Stout.

AMCO asserts that our holding unjustly provides Stout with a windfall. While it is true that our holding results in a windfall for Stout, it is also true that a holding in AMCO's favor would result in a windfall for AMCO. Had AMCO promptly reimbursed Stout's loss, it would have paid the policy limit of $20,000. Thus, if we accepted AMCO's argument that it is obligated to pay only $12,471.44, AMCO would experience a windfall of $7,528.56.

■ Under our case law, if there is to be a windfall either to an insurer or to an insured, the windfall should go to the insured. *Wallace*, 302 N.W.2d at 340; *Van Tassel v. Horace Mann Mut. Ins. Co.*, 296 Minn. 181, 187, 207 N.W.2d 348, 352 (1973). We explained the reason for this rule in *Van Tassel*, stating that "it seems more just that the insured who has paid a premium should get all he paid for rather than that the insurer should escape liability for

that for which it collected a premium." 296 Minn. at 187, 207 N.W.2d at 352. The situation here is somewhat different because Stout is seeking to recover benefits under a policy for which he did not pay a premium. Nevertheless, the owner of the car that hit Stout did pay a premium to AMCO in exchange for a no-fault automobile insurance policy, and that policy obligates AMCO to provide coverage for loss suffered by uninsured pedestrians injured in accidents involving the car. Echoing our statement in *Van Tassel*, "it seems more just" that, if there is to be a windfall, it should go to Stout rather than AMCO.

Affirmed.