Dean DO, Appellant,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Respondent.

No. A07–1461.

Supreme Court of Minnesota.

March 25, 2010.

D. Scott Dunham, D. Scott Dunham, P.A., Stillwater, MN, for appellant.

Tammy M. Reno, Mark Pryor, Brown & Carlson, P.A., Minneapolis, MN, for respondent.

Paul D. Peterson, Lori L. Barton, Harper & Peterson, P.L.L.C., Woodbury, MN, for amicus curiae Minnesota Association for Justice.

## OPINION

DIETZEN, Justice.

Appellant Dean Do brought an action against his automobile insurer, respondent American Family Mutual Insurance Company (American Family), seeking no-fault medical expense benefits related to a motor vehicle accident. Following a jury verdict awarding Do damages from American Family, the district court reduced the award, concluding that a settlement pay-

ment Do received from the at-fault driver's automobile insurer is a "collateral source" that should be deducted from the jury award under Minnesota's collateral source statute, Minn.Stat. § 548.251 (2008).[1] The court of appeals affirmed the district court's application of the collateral source statute. Because we conclude that a payment made by a tortfeasor's automobile insurer is not a collateral source under the collateral source statute, we reverse the court of appeals and remand to the district court.

In 2002, Do was injured in an automobile accident in Apple Valley, Minnesota. Do was turning left onto County Road 23 when his vehicle was struck by a vehicle driven by Julie Wagner (the tortfeasor), the at-fault driver. Do suffered injuries as a result of the accident.

At the time of the accident, Do's vehicle was covered by an automobile insurance policy from American Family. The policy included $30,000 in no-fault medical expense benefits. After the accident, Do incurred medical bills totaling $40,853.13. Do submitted the bills to American Family for payment, but American Family paid only $865.50. American Family refused to pay the other bills on the grounds that Do's medical expenses were not reasonable, necessary, or related to the accident.

Do commenced a tort action against the tortfeasor and reached a settlement with her automobile insurer, which paid Do $28,000 of the tortfeasor's $30,000 liability policy limit. The settlement payment was not allocated to any specific items of damage.

Do later commenced an action against American Family, seeking no-fault and underinsured motorist benefits. Do's action proceeded to trial, and the jury returned a verdict against American Family, awarding Do damages of $49,416.13. The jury award included $39,416.13 for past medical expenses, $5,000 for past pain and disability, and $5,000 for future pain and disability.

American Family filed a post-trial motion for a collateral source offset and amended findings.[2] The district court found that the $28,000 payment from the tortfeasor's automobile insurer is a collateral source under Minn.Stat. § 548.251. Therefore, the district court deducted the $28,000 settlement payment and the $865.50 in no-fault benefits previously paid by American Family from the jury verdict of $49,416.13, resulting in a net award of $20,550.63. The court reasoned that if there were no offset for the settlement payment, there would be a total recovery of $58,000,[3] which would result in a "double recovery" contrary to the No–Fault Act. See Richards v. Milwaukee Ins. Co., 518 N.W.2d 26, 28 (Minn.1994).

The court of appeals affirmed, concluding that Do's prior settlement with the tortfeasor's automobile insurer is a collateral source under Minn.Stat. § 548.251 and, therefore, the district court did not

1. The collateral source statute was numbered as Minn.Stat. § 548.36 from its inception in 1986 until 2008. The statute was renumbered as section 548.251 in 2008 without any changes in its language.

2. American Family did not argue either prior to or during trial in the district court that the $28,000 settlement payment should be deducted under the collateral source statute. Rather, American Family asked the court to offset the $28,000 settlement payment against

the jury award under the terms of the contract of insurance between Do and American Family. American Family did argue that the $865.50 in no-fault medical expense benefits previously paid was a collateral source.

3. It appears that the district court arrived at the $58,000 figure by adding Do's $30,000 policy limit to the $28,000 payment from the tortfeasor's insurer, without accounting for American Family's earlier no-fault payment of $865.50.

err in deducting the $28,000 settlement payment from the ultimate jury award against American Family. *Do v. Am. Family Mut. Ins. Co.,* 752 N.W.2d 109, 111 (Minn.App.2008). The court of appeals acknowledged that the procedural posture of this case was unusual because of the order of recovery, but stated that the procedural posture should not affect the outcome of the case. *Id.* at 116. Taking into account the deduction of the settlement payment and the previous no-fault payment, the court of appeals concluded that Do is entitled to $20,550.63 in no-fault benefits and "no more." *Id.*

Do petitioned for review, asking us to decide whether the courts below correctly classified the $28,000 settlement payment from the tortfeasor's automobile insurer as a collateral source under the collateral source statute. We granted the petition and granted leave for Minnesota Association for Justice (MAJ) to file an amicus brief.

## I.

■ Do argues that the $28,000 payment from the tortfeasor's automobile insurer is not a "collateral source" under the collateral source statute, Minn.Stat. § 548.251. When the underlying facts of a case are undisputed, an appellate court will review de novo the district court's application of the law. *Dean v. Am. Family Mut. Ins. Co.,* 535 N.W.2d 342, 343 (Minn.1995). Here, the underlying facts are not disputed. Thus, we must examine whether the district court erred in applying the collateral source statute. We review questions of statutory application under a de novo standard. *S. Minn. Mun. Power Agency v. Boyne,* 578 N.W.2d 362, 364 (Minn. 1998).

The issue raised by Do requires us to determine the applicability of Minnesota's collateral source statute. More particularly, we must answer the question of whether the statute requires the deduction of a settlement payment made by the tortfeasor's automobile insurer from the plaintiff's subsequent judgment against his own automobile insurer for no-fault benefits. To do so, we must review various provisions of the No–Fault Act, and the collateral source statute, and the applicability of these statutes to Do's claim for no-fault benefits.

### A. Minnesota's No–Fault Act

■ We begin our analysis with Minnesota's No–Fault Act, Minn.Stat. §§ 65B.41–65B.71 (2008). Do's claim against American Family was for no-fault benefits and underinsured motorist (UIM) benefits. Based on the jury's verdict at trial, Do has conceded that the tortfeasor is not underinsured and that he does not have a UIM claim against American Family.[4] Thus, Do's claim here is limited to no-fault benefits—specifically, medical expense benefits.

When an insured person suffers injuries arising out of the maintenance or use of a motor vehicle, that person is entitled to basic economic loss benefits, also known as no-fault benefits, which include medical expense benefits and income loss benefits.

4. Whether a tortfeasor is underinsured is determined by comparing the net amount of the jury verdict minus the no-fault benefits paid or payable by the plaintiff's no-fault insurer and the "best settlement," which is the amount obtained from the tortfeasor's insurer to settle the liability claim. *See Dohney v. Allstate Ins. Co.,* 632 N.W.2d 598, 607 (Minn. 2001). Here, the net amount of the jury ver-

dict minus the no-fault benefits is $19,416.13 ($49,416.13–$30,000), and the "best settlement" is $28,000. Because the settlement of $28,000 exceeds the amount of the net liability award ($19,416.13), the tortfeasor is not underinsured. *See* Minn.Stat. § 65B.43, subd. 17 (defining "underinsured motor vehicle").

Minn.Stat. § 65B.44. The No–Fault Act requires minimum coverage of $20,000 in medical expense benefits, *id.*, subd. 1, but in this case Do's policy with American Family provided $30,000 in coverage for medical expense benefits. Medical expense benefits reimburse a wide range of reasonable and necessary medical expenses, including medical, chiropractic, and rehabilitative services. *See id.*, subd. 2.

One of the purposes of the No–Fault Act is to encourage prompt payment of medical expense benefits. Minn.Stat. § 65B.42. "Basic economic loss benefits are payable monthly as loss accrues." Minn.Stat. § 65B.54, subd. 1. Loss accrues as medical expenses are incurred, and benefits generally are overdue if not paid within 30 days after the no-fault insurer "receives reasonable proof of the fact and amount of loss realized." *Id.* The statute also provides that "[o]verdue payments shall bear simple interest at the rate of 15 percent" per year. *Id.*, subd. 2. In this case, the parties disputed at trial whether Do's claimed medical expenses were reasonable, necessary, and related to the accident.

 A claim for no-fault benefits is separate and distinct from a tort claim against the tortfeasor and the tortfeasor's insurer. *See* Minn.Stat. § 65B.49, subds. 2, 3 (governing basic economic loss benefits and residual liability insurance, respectively). Basic economic loss benefits "shall be primary with respect to" any other benefits available to an injured person. Minn.Stat. § 65B.61 (but providing exception for workers' compensation benefits). An insurance company "has a duty to pay basic economic loss benefits to its insured without regard to fault." *Milbrandt v. Am. Legion Post of Mora*, 372 N.W.2d 702, 705 (Minn.1985). Similarly, "a no-fault insurer has a duty to provide basic economic loss benefits to reimburse an injured person's loss even when the injured person is entitled to compensation for the same loss

from a different source." *Stout v. AMCO Ins. Co.*, 645 N.W.2d 108, 114 (Minn.2002) (holding that a no-fault insurer cannot reduce the amount of no-fault benefits payable to an injured person when the injured person's health insurer pays the medical bills at a discounted rate).

But the No–Fault Act does provide statutory offsets to avoid duplicate recovery. *See* Minn.Stat. § 65B.42(5). When an injured person brings a negligence action, an offset provision requires the court to deduct from any tort recovery the value of no-fault benefits paid or payable by the no-fault insurer:

> With respect to a cause of action in negligence ... the court shall deduct from any recovery the value of basic or optional economic loss benefits paid or payable, or which would be payable but for any applicable deductible.

Minn.Stat. § 65B.51, subd. 1. In addition, the No–Fault Act specifies that "[n]o recovery shall be permitted under the uninsured and underinsured motorist coverages of this section for basic economic loss benefits paid or payable, or which would be payable but for any applicable deductible." Minn.Stat. § 65B.49, subd. 3a(4). Here, Do settled the tort claim with the tortfeasor's insurer. The offset provisions in section 65B.51 therefore are not applicable.

### B. The Collateral Source Statute

We turn next to the applicability of Minnesota's collateral source statute, Minn.Stat. § 548.251, to a settlement payment made by the tortfeasor's insurer. The Minnesota Legislature enacted the collateral source statute in 1986, partially abrogating the common-law collateral source rule for computing certain tort judgments. *See* Act of Mar. 25, 1986, ch. 455, § 80, 1986 Minn. Laws 840, 878–79. The common-law rule allows an injured person to recover damages from a tortfea-

sor even when that award results in a double recovery. *Hueper v. Goodrich*, 314 N.W.2d 828, 830 (Minn.1982). In *Hueper*, we noted multiple rationales for the common-law rule. One rationale is that when a plaintiff has paid for a benefit, for example, by purchasing an insurance policy, he "should be reimbursed and the tortfeasor should not get a windfall." *Id.* Other justifications for the common-law rule are that a tortfeasor "should be punished by being made to take full responsibility for his negligence and that [a] plaintiff will be more fully compensated if he is allowed to recover from the tortfeasor." *Id.*

■ The collateral source statute changed the common-law rule by allowing a party found liable for tort damages to reduce any award against that party by payments made to the plaintiff by certain enumerated collateral sources. Minn.Stat. § 548.251, subds. 2, 3. The primary purpose of the statute is to prevent double recoveries. *Imlay v. City of Lake Crystal*, 453 N.W.2d 326, 335 (Minn.1990). We have said that applying the statute when the injured plaintiff has been undercompensated "is not justified." *Id.*

The collateral source statute sets forth a procedure in which a party in a civil action may request the court to determine and deduct collateral sources from the jury verdict. *See* Minn.Stat. § 548.251, subd. 2. The statute defines "collateral sources" in relevant part as "payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict," including payments pursuant to "health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage." Minn.Stat. § 548.251, subd. 1(2).

■ Our primary goal in statutory interpretation is to give effect to the intent of the legislature. *Auto Owners Ins. Co. v. Perry*, 749 N.W.2d 324, 326 (Minn.2008).

"Generally, statutes in derogation of the common law are to be strictly construed." *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 327 (Minn.2004); *accord* 73 Am. Jur. 2d *Statutes* § 191 (2001) (stating that courts do not presume that "the legislature intended to abrogate or modify a rule of the common law on the subject any further than that which is expressly declared or clearly indicated").

American Family argues for a broad interpretation of "collateral sources" that would include a liability payment from a tortfeasor's automobile insurer. Do argues for a narrow interpretation that would exclude a tort settlement, relying on our previous decision in *Dean v. American Family Mutual Insurance Co.*, where we stated that "a tortfeasor's liability insurance cannot, by definition, constitute a collateral source." 535 N.W.2d at 345.

In *Dean*, the plaintiff settled with the tortfeasor's liability insurer for $100,000 before suing his own insurer for UIM benefits. *Id.* at 343. The issue we addressed in *Dean* was whether, in a claim for UIM benefits, a settlement payment from the tortfeasor's automobile liability insurer triggers the collateral source statute when the plaintiff is partially at fault. *Id.* Essentially, we were deciding whether the district court should have made a deduction for the UIM claimant's personal fault before or after deducting the proceeds already received from the tortfeasor's automobile insurer. *Id.; see* Minn.Stat. § 65B.49, subd. 4a (2008) (stating that the maximum liability of a UIM insurer is "the amount of damages sustained but not recovered from the insurance policy of the driver or owner of any underinsured at fault vehicle").

In *Dean*, we concluded that the district court erred by deeming the $100,000 liability payment from the tortfeasor's automobile insurer a collateral source. 535 N.W.2d at 345. We reached this conclu-

sion based in part on the definition of "collateral source rule" in *Black's Law Dictionary,* which reads as follows:

> Under this rule, if an injured person receives compensation for his injuries from *a source wholly independent of the tort-feasor,* the payment should not be deducted from the damages which he would otherwise collect from the tortfeasor. In other words, a defendant tort-feasor may not benefit from the fact that the plaintiff has received money from other sources as a result of the defendant's tort, *e.g.* sickness and health insurance.

*Id.* (quoting *Black's Law Dictionary* 262 (6th ed. 1990) (emphasis added) (citations omitted)). We also noted our previous statement that "one distinguishing element of a collateral source is that the money or services in reparation of plaintiff's injury is *from a source other than the tortfeasor.*" *Id.* (emphasis added) (citing *Hueper,* 314 N.W.2d at 830). Relying on the language of the collateral source statute and the underlying justifications for the statute, we held that "a tortfeasor's liability insurance payment does not trigger" the collateral source statute. *Id.* We noted our previous concerns about the statutory definition of collateral source and stated that "while it might not be precisely clear exactly what the legislature meant to include as a collateral source, it is patently clear that a tortfeasor's liability insurance can never be within the definition of collateral source." *Id.* Thus, our interpretation of the collateral source statute here is consistent with the language of the statute and our prior case law.

■ Consistent with *Dean,* we conclude that a payment made by a tortfeasor to an injured party is a direct source rather than a collateral source. Under the common law, we have understood a collateral source to mean a source unrelated to and unconnected with the tortfeasor. *Hueper,* 314 N.W.2d at 830. In the absence of clear statutory language, we will not expand the definition of "collateral source" to include a source related to a tortfeasor. *See Ly v. Nystrom,* 615 N.W.2d 302, 314 (Minn.2000) (stating that "if a statute abrogates the common law, the abrogation must be by express wording or necessary implication").

We disagree with the court of appeals' suggestion that we have retreated from our statements in *Dean* that a tortfeasor's liability insurance does not fall within the definition of a collateral source. *Do,* 752 N.W.2d at 116. The court of appeals cited our decision in *Western National Mutual Insurance Co. v. Casper,* 549 N.W.2d 914, 916 (Minn.1996), and stated that the facts of *Casper* are "more closely aligned" to this case than the facts of *Dean. Do,* 752 N.W.2d at 116. In *Casper,* the order of events was the same as in *Dean:* the plaintiff settled with the tortfeasor's automobile liability insurer for $50,000, then sought UIM benefits from his employer's insurer. *Casper,* 549 N.W.2d at 915. The plaintiff and the insurer submitted to an arbitration panel the amount of benefits due, and the panel awarded the plaintiff $120,000. *Id.* We held that the tortfeasor's $50,000 settlement payment should be deducted as an offset from the arbitration award. *Id.* at 915–16. We did not specify the type of offset applied in *Casper,* and our analysis did not mention the collateral source statute, nor did it discuss *Dean* or any other case law.[5] *Id.* Noth-

---

5. Our only discussion in *Casper* of the collateral source statute concerned the insurer's separate argument that it was entitled to an offset based on the amount of workers' compensation benefits paid to the plaintiff or the value of future workers' compensation benefits paid. 549 N.W.2d at 916–18. We concluded that the insurer was not entitled to such an offset. *Id.* at 918.

ing in *Casper* negates the analysis that we set forth in *Dean* regarding the proper interpretation of the collateral source statute.

We acknowledge our observation in *Imlay* that subdivision 1(2) of the collateral source statute is poorly written and susceptible of different meanings. 453 N.W.2d at 334. But *Imlay* did not consider whether subdivision 1(2) applies to liability payments from the tortfeasor's insurer. Rather, *Imlay* considered whether uninsured motorist benefits constitute a collateral source. 453 N.W.2d at 333. *Imlay* did not address the issue before us, and therefore is not applicable.

We recognize that based upon our interpretation of the statute, it is possible that a plaintiff who chooses to pursue his claim serially first against the tortfeasor and then against his own no-fault insurer may receive a windfall. But the plaintiff also takes a risk in pursuing his claims piecemeal that he will receive less than full compensation. Further, the No–Fault Act specifically provides that the value of no-fault benefits "paid or payable" shall be deducted from any recovery in a negligence action arising out of a motor vehicle accident. Minn.Stat. § 65B.51, subd. 1. Ultimately, the question of a potential windfall to the plaintiff in this circumstance is one for the legislature and not this court. In any event, the no-fault insurer paid exactly what it was required to pay: basic economic loss benefits "without regard to fault." *Milbrandt*, 372 N.W.2d at 705.

In summary, liability payments made by a tortfeasor's automobile insurer are not a collateral source for purposes of the collateral source statute. A no-fault insurer's obligation to pay no-fault benefits is primary and is not subject to an offset under the collateral source statute. No-fault benefits must be paid regardless of the outcome of the tort case, and those payments are not reduced by any tort recovery. Consequently, because the jury found that Do reasonably incurred medical expenses that exceeded the $30,000 medical expense limits of his American Family policy, Do is entitled to receive from American Family the policy limits of $30,000 minus the $865.50 previously paid.

Accordingly, we reverse the court of appeals and remand the case to the district court for recalculation of Do's net judgment against American Family in a manner consistent with this opinion.

Reversed and remanded.

MAGNUSON, C.J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I concur in the result reached by the majority, but I disagree with its analysis. Based on its reading of Minn.Stat. § 548.251, subd. 1(2), the majority in essence concludes that subdivision 1(2) is not ambiguous as applied to the dispute in this case and therefore concludes it is not necessary to go beyond the text of the statute to determine its meaning. I conclude that subdivision 1(2) is ambiguous as to whether payments by a tortfeasor's automobile liability insurer are collateral and that a more comprehensive analysis of the statute's meaning is necessary. After conducting such an analysis, I, like the majority, conclude that Minn.Stat. § 548.251, subd. 1(2), does not apply to a settlement payment made by a tortfeasor's automobile insurer to an injured person who was later awarded no-fault benefits from his automobile insurer.

The crux of the issue raised by Do is how to interpret the language in subdivision 1(2). The parties dispute how we should read this language. American Family argues that we should read the

statute as applying to payments pursuant to "automobile accident insurance," an interpretation broad enough to include a payment from the tortfeasor's automobile liability insurer. Do argues that we should read the statute as applying to payments pursuant to automobile accident insurance that "provides health benefits or income disability coverage," a narrower interpretation which would exclude a tortfeasor's liability insurance settlement payment.

As the majority states, our goal in statutory interpretation is to give effect to the intent of the legislature. *Heine v. Simon,* 702 N.W.2d 752, 764 (Minn.2005). When interpreting a statute, we first examine whether the statute's language is clear or ambiguous on its face. *Id.* A statute is ambiguous when its language is subject to more than one reasonable interpretation. *Id.* Ambiguity can arise from the statute's application to the facts of a particular case. *Id.* (citing Minn.Stat. § 645.16 (2004)). We presume that statutes are consistent with the common law, and if a statute abrogates the common law, "the abrogation must be by express wording or necessary implication." *Brekke v. THM Biomedical, Inc.,* 683 N.W.2d 771, 776 (Minn.2004) (citation omitted) (internal quotation marks omitted).

We have previously said that subdivision 1(2) of the collateral source statute is ambiguous. *Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 333–34 (Minn.1990). The parties in *Imlay* made arguments similar to the parties here. *Id.* at 334. But we did not settle the question of how to interpret the statute; instead, we said the stat-

ute's language was "poorly written [and] ambiguous" and that the language "could conceivably be read as providing for one, two, three or four different types of collateral source benefits." *Id.* Because we concluded there were "grammatical and analytical problems with each of the possibilities," we recommended that the legislature clarify its intent. *Id.* But the legislature has not responded to this suggestion by revising the statute.[1] As a result, we are still faced with language in section 548.251 that is ambiguous.

The use of the word "or" twice in section 548.251, subdivision 1(2), is key to the uncertainty regarding the meaning of the collateral source statute. Every use of "or" as a conjunction "involves *some* risk of ambiguity." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 624 (2d ed. 1995). This ambiguity can arise because the word "*or* has an inclusive sense as well as an exclusive sense." *Id.* The use of the word "or" in subdivision 1(2) raises the question as to what the phrase "that provides health benefits or income disability coverage" modifies. How one reads the word "or"—inclusively or exclusively—can lead either to the broad reading of the text advocated by American Family or to the narrow reading urged by Do.

Here, as we did in *Imlay,* I conclude that our court cannot determine the meaning of the statute based on reference to the text alone. I conclude the statute is ambiguous because it is subject to more than one reasonable interpretation—one being that subdivision 1(2) refers to *any* payment related to automobile accident insur-

1. Professor Michael K. Steenson, author of a guide to Minnesota's no-fault system, suggests the legislature may have deliberately chosen not to apply the collateral source statute to a tortfeasor's payment. Steenson said:
 While the collateral source statute can be construed to cover a third party's automo-

bile liability insurance ... *an alternative explanation is that the statute, by its terms, simply does not reach automobile liability insurance.*
Michael K. Steenson, *Minnesota No–Fault Automobile Insurance* § 9.03, at 9–13 (3d ed. 2009) (emphasis added).

ance, including a payment under the tortfeasor's automobile insurance policy, and another being that the language applies only to benefits paid by the plaintiff's own no-fault insurer, which provides health benefits and income disability coverage. Thus I conclude that it is necessary to look beyond the text, to our court's previous decisions regarding the collateral source statute and no-fault automobile insurance.

Several of our previous cases suggest that a payment by a tortfeasor's insurer falls outside the definition of a collateral source. In *Dean v. American Family Mutual Insurance Co.*, we stated that "a tortfeasor's liability insurance cannot, by definition, constitute a collateral source." 535 N.W.2d 342, 345 (Minn.1995). We stated in *Dean* that although the legislature had not been "precisely clear" in defining collateral sources, "it is patently clear that a tortfeasor's liability insurance can never be within the definition of collateral source." *Id.* We reached this conclusion based in part on the definition of the common-law collateral source rule in *Black's Law Dictionary*, which reads, "Under this rule, if an injured person receives compensation for his injuries from *a source wholly independent of the tort-feasor*, the payment should not be deducted from the damages which he would otherwise collect from the tort-feasor." *Id.* (quoting *Black's Law Dictionary* 262 (6th ed. 1990) (emphasis added)). We also noted our previous statement that "one distinguishing element of a collateral source is that the money or services in reparation of plaintiff's injury *is from a source other than the tortfeasor.*" *Id.* (emphasis added) (citing *Hueper v. Goodrich*, 314 N.W.2d 828, 830 (Minn.1982)). Though the collateral source statute partially abrogated the common-law collateral source rule and does not allow plaintiffs to receive double recoveries in certain situations, the fact that a payment from a tortfeasor was not and could not be a collateral source under

the common-law rule is instructive to our analysis of Minn.Stat. § 548.251, subd. 1(2). In other words, the language and analysis in *Dean* discussing common-law definitions is helpful because though the rule on whether collateral sources can be used to reduce a plaintiff's damage award has changed, the fact that a tortfeasor's payments have never been collateral sources informs our analysis of whether a settlement payment made by a tortfeasor's insurer is a collateral source.

I, like the majority, disagree with the court of appeals' suggestion that we have retreated from our statements in *Dean* that a tortfeasor's liability insurance can never be within the definition of a collateral source. *Do v. Am. Family Mut. Ins. Co.*, 752 N.W.2d 109, 116 (Minn.App.2008). The court of appeals cited our decision in *Western National Mutual Insurance Co. v. Casper*, 549 N.W.2d 914, 916 (Minn. 1996), and stated that the facts of that case were "more closely aligned" to Do's case than were the facts of *Dean*. *Do*, 752 N.W.2d at 116.

In *Casper*, the order of events was the same as in *Dean*: the plaintiff settled with the tortfeasor's automobile liability insurer for $50,000, then sought UIM benefits from his employer's insurer. *Casper*, 549 N.W.2d at 915. The plaintiff and the insurer could not agree on the amount of UIM benefits due and submitted the matter to an arbitration panel. *Id.* The arbitration panel awarded the plaintiff $120,000 from the insurer. *Id.* We held that the tortfeasor's $50,000 settlement payment should be deducted from the arbitration award. *Id.* at 915–16. We did not discuss whether there should be a deduction, only whether the deduction amount should be the full $50,000 settlement payment made by the tortfeasor's liability insurer, or the $13,589 net amount that Casper received from the settlement.

*Id.* It is not clear what type of offset we were applying in *Casper* because our analysis of the offset issue did not specifically mention the collateral source statute, nor did it discuss *Dean* or any other case law.[2] *Id.* The procedural and factual history of *Casper* is complex, but given how it was resolved, I conclude that nothing in *Casper* negates the analysis that we set forth in *Dean* regarding the collateral source statute.

As suggested in *Dean*, the collateral source statute was written to classify payments by an injured person's no-fault insurer as a collateral source because it is the no-fault insurer that provides the injured person with "health benefits or income disability coverage." Minn.Stat. § 548.251, subd. 1(2). Here, it was Do's no-fault insurance policy, not the tortfeasor's liability insurance, that provided Do with health benefits and income disability coverage.[3] Because the tortfeasor's liability insurance settlement payment did not provide Do with health benefits and income disability coverage, it is not a collateral source as defined by Minn.Stat. § 548.251, subd. 1(2).

The order of events in *Nelson v. American Family Insurance Group* is similar to Do's case and I find our holding in *Nelson* to be instructive, given that it was decided after both *Dean* and *Casper*. 651 N.W.2d 499 (Minn.2002). In *Nelson*, after the plaintiff, Sharon Nelson, was involved in an accident in South Dakota, her insurer denied her no-fault claims, and she commenced a personal injury action against the tortfeasor. *Id.* at 502. The jury returned a verdict against the tortfeasor, awarding Nelson damages of $37,000 for past income loss. *Id.* One-third of Nelson's recovery for past income loss was paid to her attorney under a contingency fee arrangement. *Id.* Nelson then sued her insurer for no-fault benefits. *Id.* The issue before us was whether Nelson was entitled to no-fault benefits to the full extent of attorney fees paid to achieve her tort recovery. *Id.* at 503.

In concluding that Nelson's insurer was obligated to pay its proportional share of her attorney fees, we rejected proposed solutions that would have resulted in a windfall for Nelson or her insurer. *Id.* at 509–10. We concluded Nelson was entitled to "a recovery that mirrors what she would have received if [her insurer] had initially paid the no-fault benefits." *Id.* at 509. We said that adopting the position of Nelson's insurer "would frustrate the Act's purpose to ensure prompt payment of no-fault benefits because it would encourage insurers to delay payment of no-fault benefits in the hope that the insured would recover up to the policy limits from a third-party tortfeasor." *Id.* at 510. Based on the foregoing case law, I conclude that a core principle of the No–Fault Act is that automobile insurers bear the responsibility

2. Our only discussion in *Casper* of the collateral source statute concerned the insurer's separate argument that it was entitled to an offset based on the amount of workers' compensation benefits paid to the plaintiff or the value of future workers' compensation benefits paid. 549 N.W.2d at 916–18. We held that the insurer was not entitled to such an offset. *Id.* at 918.

3. Robert J. Hauer, Jr., an attorney who writes and lectures on no-fault insurance matters, has stated that a tortfeasor is not within the definition of a collateral source:

[A] "collateral source" is a third party (i.e. not the party injured and *not the party causing the injury* ) who makes payments to or on behalf of the injured person. The collateral source is typically an insurance company, an employer, or a welfare agency that has paid medical or disability benefits.

Robert J. Hauer, Jr., *Collateral Sources Issues,* in *Uninsured, Underinsured & No–Fault Insurance Update* 1, 1 (Minn. State Bar Ass'n Continuing Legal Educ. 2008) (emphasis added).

for paying basic economic loss benefits—no-fault benefits—to their policyholders, and any incentive to shift that responsibility to tortfeasors is not looked upon with favor.

With the foregoing analytical framework in mind, the next step in my analysis is to determine whether the collateral source statute applies to Do's recovery from American Family. I acknowledge that if the district court had not applied the collateral source statute, and instead followed the procedure that Do advocates, then Do would have received a recovery greater than the amount the jury set as his total damages. Arguably, such a recovery amount results in a windfall to Do. But I conclude that subtracting the amount paid by the tortfeasor's insurer from the jury award essentially rewards American Family for its resistance to paying no-fault benefits for which Do had contracted and to which the jury determined he was entitled. As a result of the court of appeals' decision, American Family emerges at the end of these proceedings obligated to pay Do only $21,416.13 out of Do's no-fault policy limit of $30,000. Put another way, the court of appeals' decision means American Family does not have to pay $8,583.87 in benefits that it contracted to pay and was obligated to pay under its policy pursuant to the No–Fault Act. In essence, the court of appeals' decision allows American Family to receive a windfall as a consequence of its refusal to pay Do's no-fault medical expense benefits.

If the choice is to give a windfall to one party or another, our precedent informs us that we should read the collateral source statute in favor of a plaintiff in Do's posi-

tion. One of the purposes of the No–Fault Act is to "provide offsets to avoid duplicate recovery," Minn.Stat. § 65B.42(5) (2008), but we have said that "if there is to be a windfall either to an insurer or to an insured, the windfall should go to the insured," *Stout v. AMCO Ins. Co.*, 645 N.W.2d 108, 114 (Minn.2002). We have also said that "if the question must be resolved on the basis of who gets a windfall, it seems more just that the insured who has paid a premium should get all he paid for rather than that the insurer should escape liability for that for which it collected a premium." *Van Tassel v. Horace Mann Mut. Ins. Co.*, 296 Minn. 181, 187, 207 N.W.2d 348, 352 (1973).

I am also concerned that the court of appeals' reading of the collateral source statute will encourage insurers to delay paying no-fault benefits because of the possibility that the tortfeasors may pay some or all of what the no-fault insurer was obligated to pay its injured insureds. This likelihood risks undermining Minnesota's no-fault system, which is predicated in part on "prompt payment of specified basic economic loss benefits to victims of automobile accidents" regardless of who was at fault for the accident, and "appropriate medical ... treatment of ... automobile accident victim[s]" through "prompt payment for such treatment." Minn.Stat. § 65B.42(1), (3) (2008). The prospect of delayed payments by insurers was a concern we had in *Nelson*.[4] *See* 651 N.W.2d at 505 (citing Minn.Stat. § 65B.42); *see also Stout*, 645 N.W.2d at 114. I do not believe the legislature intended the collateral source statute to operate in this fashion—allowing insurers to

---

4. In *Nelson*, in hopes of serving both the no-fault policies promoting prompt payment and discouraging double recovery, we attributed to the no-fault insurer a pro-rated share of Nelson's attorney fees, thereby allowing Nelson "a recovery that mirrors what she would have received if [her insurer] had initially paid the no-fault benefits." 651 N.W.2d at 509. Unlike in *Nelson*, the parties here have not presented any arguments or facts involving attorney fees.

escape their obligations under the No–Fault Act and shift responsibility for no-fault benefits to a tortfeasor's insurer.[5]

For the foregoing reasons, I conclude that a payment by a tortfeasor's liability insurer is not a collateral source for purposes of the collateral source statute, Minn.Stat. § 548.251. Therefore, I agree with the majority that the district court and the court of appeals erred when they held that the collateral source statute required the district court to reduce Do's injury award by $28,000, the amount of the settlement payment. Accordingly, I agree that we should reverse the court of appeals and remand the case to the district court for recalculation of Do's net judgment against American Family in a manner consistent with this opinion.

Finally, I note that Do makes a second argument involving the district court's method of calculating the net judgment. Do argues that the court should have first calculated his no-fault recovery and then calculated the UIM recovery. Do argues that in *Richards v. Milwaukee Insurance Co.*, 518 N.W.2d 26, 28 (Minn.1994), we made it clear that the court is to first calculate a plaintiff's final no-fault recovery and then determine whether there has been a successful UIM claim. Because Do concedes that he has no UIM claim against American Family, I conclude that we need not and should not reach this issue.

---

5. Professor Michael Steenson acknowledges that reading a tortfeasor's liability insurance payment as outside the collateral source statute would result in a windfall to the plaintiff, but he adds:

[P]laintiffs received windfalls before the adoption of the collateral source statute, and it is arguable that *the legislature simply failed to address the unique problem ...* in *Do*. But, as in other cases, a policy, in this case the policy against double recovery, would not override the legislative omission. If the problem is to be corrected, it would be the legislature's to correct.

Steenson, *supra*, § 9.03, at 9–13 (emphasis added).