# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-3128
_____

Taqueria El Primo LLC, on behalf of themselves and others similarly situated;
Victor Manuel Delgado Jimenez, on behalf of themselves and others similarly
situated; Mitchelle Chavez Solis, on behalf of themselves and others similarly
situated; Benjamin Tarnowski, on behalf of themselves and others similarly
situated; El Chinelo Produce, Inc., on behalf of themselves and others similarly
situated; Virginia Sanchez-Gomez, on behalf of themselves and others similarly
situated

*Plaintiffs - Appellees*

v.

Illinois Farmers Insurance Company; Farmers Insurance Exchange; Farmers
Group, Inc.; Truck Insurance Exchange; Farmers Insurance Company, Inc.; Mid-
Century Insurance Company

*Defendants - Appellants*

------------------------------

Coalition Against Insurance Fraud

*Amicus on Behalf of Appellant(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: March 14, 2024
Filed: July 31, 2024
_____

Before COLLOTON, Chief Judge, ERICKSON and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

"Operation Back Cracker"—a joint state and federal criminal investigation—exposed a ring of Minnesota healthcare providers (mostly chiropractors) who were recruiting car accident victims and fraudulently billing auto insurers for their treatment.[1] In related civil settlements, several providers agreed not to bill some of the insurance companies for any treatment provided to their insureds. Concluding that these no-bill agreements violate the Minnesota No-Fault Automobile Insurance Act, Minn. Stat. §§ 65B.41–.71, the district court enjoined Illinois Farmers Insurance Company and others (together, Farmers) from entering into or enforcing them.

This case poses a question of first impression: whether no-bill agreements "ha[ve] the effect of providing[] managed care services" or place "preestablished limitations on [medical expense] benefits" within the meaning of the No-Fault Act. After careful consideration, we conclude that they do not, so we vacate the injunction.

I.

Plaintiffs represent both an injunctive class and a damages class of people insured by Farmers. They sued after discovering that Farmers has confidential no-bill agreements with a few providers, alleging that the agreements violate the No-Fault Act.

_____

[1]For a description of how the schemes worked, see *United States v. Luna*, 968 F.3d 922, 924–26 (8th Cir. 2020).

The No-Fault Act requires insurers to provide "[b]asic economic loss benefits" when an insured is injured by "the maintenance or use of a motor vehicle." § 65B.44, subd. 1(a). Those benefits "provide reimbursement for all loss suffered through injury," *id.*, including "income loss, replacement services loss," and—most relevant here—"medical expense," § 65B.43, subd. 7 (defining "Loss").

Medical expense benefits "consist[] of . . . $20,000 for medical expense loss arising out of injury to any one person," § 65B.44, subd. 1(a)(1), and "reimburse all reasonable expenses for necessary" items on a list of medical services, prescription drugs, and more, *id.*, subd. 2(a)(1)–(5). Insurers may not provide benefits that are "in any way less than those provided for in subdivision 2, or that involve any preestablished limitations on the benefits." *Id.*, subd. 1(b). And they may not "enter into or renew any contract that provides, or has the effect of providing, managed care services," defined as "any program of medical services that uses health care providers managed, owned, employed by, or under contract with a health plan company." *Id.*, subd. 1(c).

Medical expense benefits "become payable as loss accrues." *W. Nat'l Ins. Co. v. Nguyen*, 902 N.W.2d 645, 649 (Minn. Ct. App. 2017) (citing § 65B.54, subd. 1). And loss accrues when "bills for medical treatment" are received. *Id.* (quoting *Stout v. AMCO Ins. Co.*, 645 N.W.2d 108, 113 (Minn. 2002)). Healthcare providers must follow a statutorily prescribed method for submitting bills directly to the insurer; without doing so, they generally cannot seek payment from the patient. *See id.* at 650–51 (interpreting § 65B.54, subd. 1).

The no-bill agreements prevent providers from submitting bills to Farmers or its insureds. In a typical agreement, the provider "agrees not to submit, cause to be submitted, or seek payment on any Farmers claim . . . for any services performed from" the date of the settlement to a specified date—sometimes "into perpetuity." Some agreements go so far as to clarify that bills submitted by the provider are void and that the provider "may not collect the bills from Farmers and/or the insured/claimant who received the treatments." Most of these agreements have

expired. But a few perpetual agreements remain, and Plaintiffs claim that providers have turned them away because of no-bill agreements.

The No-Fault Act does not create a private right of action, so Plaintiffs sought an injunction under the Uniform Deceptive Trade Practices Act (UDTPA), §§ 325D.44–.45, and damages under the Consumer Fraud Act, §§ 325F.69, 8.31, subd. 3a. The district court granted summary judgment to the injunctive class and enjoined Farmers from entering into or enforcing no-bill agreements. It ruled that the no-bill agreements "ha[ve] the effect of providing[] managed care services" and set "preestablished limitations on [medical expense] benefits"—both violations of the No-Fault Act. § 65B.44, subd. 1(b)–(c). And that meant Farmers was, in turn, violating the UDTPA by certifying that its policies complied with the No-Fault Act when they did not. *See* § 325D.44, subd. 1(5), (7). Farmers appeals, and we have jurisdiction to review the injunction. *See Fogie v. THORN Ams., Inc.*, 95 F.3d 645, 648 (8th Cir. 1996) (citing 28 U.S.C. § 1292(a)(1)).[2]

## II.

We review the grant of an injunction for abuse of discretion. *Id.* at 649. A district court abuses its discretion if it "rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 19 v. Soo Line R.R. Co.*, 850 F.2d 368, 374 (8th Cir. 1988) (en banc).

When interpreting Minnesota law, we "read and construe a statute as a whole and must interpret each section in light of the surrounding sections." *Wilbur v. State*

---

[2]The district court also denied summary judgment to Farmers on Plaintiffs' damages claim. Farmers invites us to exercise jurisdiction over two issues relevant to the court's non-final order on that claim. But because resolving those issues "is not necessary to effectively review the injunction," we decline the invitation. *See Fogie*, 95 F.3d at 648–49 (discussing the extent of our jurisdiction under § 1292(a)(1)).

*Farm Mut. Auto. Ins. Co.*, 892 N.W.2d 521, 524 (Minn. 2017) (citation omitted). Unless defined by statute, we "give words and phrases their plain and ordinary meaning." *Sanchez v. Dahlke Trailer Sales, Inc.*, 897 N.W.2d 267, 273 (Minn. 2017) (citation omitted); *see also Gilbertson v. Williams Dingmann, LLC*, 894 N.W.2d 148, 152 (Minn. 2017). When the meaning of a term is "doubtful," we look to its "association with other . . . words and phrases" in the statute. *Wilbur*, 892 N.W.2d at 524 (citation omitted). We may also reference dictionary definitions. *Gilbertson*, 894 N.W.2d at 152.

## A.

We start with the No-Fault Act's statement that insurers may not "enter into . . . any contract that provides, *or has the effect of providing*, managed care services to no-fault claimants." § 65B.44, subd. 1(c) (emphasis added). The Act defines "managed care services" as "any program of medical services that uses health care providers managed, owned, employed by, or under contract with a health plan company." *Id.*

Leaning into the words "the effect of," the district court thought that Farmers "reverse-engineered managed care services" by creating a program where "[t]he effect is the same: insureds may only receive services from a subset of providers that Farmers has decided to favor over others." But because this conclusion unmoors "the effect of" from its context, we disagree.

The phrase "or has the effect of providing" broadens the means ("provides"), not the ends ("managed care services"). § 65B.44, subd. 1(c). Regardless of whether the no-bill agreements directly "provide[]" a program or indirectly "ha[ve] the effect of providing" one, the alleged program must be one that "*uses* health care providers managed, owned, employed by, or *under contract with* a health plan company." *Id.* (emphasis added). The no-bill providers, who make up a miniscule

-5-

portion of Minnesota providers,[3] are the only ones under contract with Farmers. And the program excludes, rather than uses, them. This does not fit subdivision 1(c)'s express definition of a "managed care services" program.

B.

Next, subdivision 1(b) prohibits insurers from providing "medical expense benefits that are in any way less than those provided for in subdivision 2, or that involve any preestablished limitations on the benefits." § 65B.44, subd. 1(b). The district court found that the word "any" expands the term "preestablished limitations" to include "any practice that limits the specific medical services in subdivision 2 in **any** way—including by restricting who may be reimbursed for providing them." Taking this provision in context, we respectfully disagree.

No matter how expansively we interpret the term "preestablished limitations," it is still cabined to limitations "on the benefits." § 65B.44, subd. 1(b). And though the statute does not expressly define "benefits," it is clear that they are not *services*. They are "reimburse[ments]" for "reasonable expenses." *Id.*, subd. 2(a); *see also id.*, subd. 1(a) ("Basic economic loss benefits shall provide reimbursement . . . ."); *Benefit*, American Heritage Dictionary of the English Language 123 (William Morris ed., 1970) ("A payment or series of payments to one in need."); *Benefit*, American Heritage Dictionary of the English Language (5th ed. 2022), https://ahdictionary.com/word/search.html?q=benefit [https://perma.cc/BJS4-QLK5] ("A payment made by a government agency or insurance company to qualifying persons in time of need[.]").

A Farmers no-bill agreement does not place any limitation on reimbursement for insureds' reasonable expenses. If a no-bill provider complies with its agreement

---

[3]Even before most of the no-bill agreements expired, Farmers had agreements with less than 1 out of every 100 licensed chiropractors in Minnesota. And that number is even smaller if we add physicians and physician assistants into the mix—about 1 out of every 1,000 licensed providers.

and never bills Farmers or its insured, the insured never "incurs [a] medical expense," *see Stout*, 645 N.W.2d at 113 ("[A]n injured person incurs medical expense as he or she receives bills for medical treatment.")—so there is nothing to reimburse. And if the provider violates its agreement and bills the insured, nothing in the agreement allows Farmers to leave the insured holding the bag. He is not a party to the agreement, and after incurring a "reasonable expense[] for [a] necessary" item, he is entitled to "reimburse[ment]" from Farmers. § 65B.44, subd. 2(a); *see also Stout*, 645 N.W.2d at 114 (holding that a no-fault insured "is entitled to the full amount reflected on his medical bills . . . . up to the policy limit").

In brief, an insurer violates the No-Fault Act if it refuses to reimburse an insured who has incurred a qualifying expense. But an insurer does not violate the Act by enforcing a no-bill agreement *against a provider*. Because the injunction prohibits the latter, it cannot stand.

### III.

We vacate the injunction and remand for further proceedings consistent with this opinion.

_____