David SWANSON, Respondent,

v.

Rebecca BREWSTER,
et al., Appellants.

No. A08–806.

Supreme Court of Minnesota.

June 30, 2010.

Kay Nord Hunt, Reid R. Lindquist, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, MN, for respondent.

Mark S. Genereux, Genereux Law Office, St. Paul, MN; and Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, MN, for appellants.

William M. Hart, Meagher & Geer, PLLP, Minneapolis, MN, for amicus curiae Minnesota Defense Lawyers Association.

Stephen P. Laitinen, Hilary J. Loynes, Larson ● King, LLP, St. Paul, MN, for amici curiae Minnesota Joint Underwriting Association and Insurance Federation of Minnesota.

Paul D. Peterson, Harper & Peterson, PLLC, Woodbury, MN; and Craig O. Sieverding, Sarah E. Hudleston, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, for amicus curiae Minnesota Association for Justice.

## OPINION

ANDERSON, PAUL H., Justice.

David Swanson sued Rebecca Brewster and Christopher Brewster to recover damages for personal injuries Swanson sustained after a motor vehicle owned by Christopher and driven by Rebecca collided with his motorcycle. A jury trial was held to determine the amount of Swanson's damages, and the jury awarded Swanson $62,259.30 in past medical expenses. In accordance with Minnesota's collateral-source statute, Minn.Stat. § 548.251 (2008),[1] the Hennepin County District Court reduced Swanson's award, in part, by the amount Swanson's medical insurer, HealthPartners, paid to Swanson's medical providers. The Brewsters appealed the court's determination, arguing that Swanson's award also should have been reduced by the discount HealthPartners secured for Swanson through negotiation with Swanson's medical providers. The Brewsters asserted that the discount is a collateral source as defined by Minn.Stat. § 548.251 and therefore the court erred when it failed to deduct the negotiated-discount amount from Swanson's damage award. The court of appeals affirmed the district court's collateral-source determination. We conclude that the negotiated discount is a collateral source under Minn. Stat. § 548.251. We reverse and remand to the district court.

On October 18, 2005, a motor vehicle driven by appellant Rebecca Brewster and owned by her father, appellant Christopher Brewster, collided with a motorcycle driven by respondent David Swanson at the intersection of Summit Avenue and Snelling Avenue in Saint Paul, Minnesota. Swanson sustained injuries from the accident and primarily sought medical care at Regions Hospital.

Swanson had health insurance coverage through HealthPartners and Christopher Brewster had motor vehicle insurance through the State Farm Mutual Automobile Insurance Company (State Farm). HealthPartners acknowledged its coverage for Swanson and notified State Farm of HealthPartners' right to assert a subrogation claim on any award to Swanson.[2] More specifically, HealthPartners claimed it had a right to "the reasonable value for any claims that have already been made or will in the future be made for medical and related services that have been provided to [Swanson]."

*Swanson's Medical Bills and the Negotiated Discount*

In seeking treatment for the injuries he sustained in the accident, Swanson incurred $62,259.30 in medical bills at Regions Hospital and other medical providers. In discharge of the obligation, Swanson paid $1,169.80 in copayments

---

1. The original collateral-source statute, Minn. Stat. § 548.36 (2006), was renumbered to Minn.Stat. § 548.251 (2008) without any change in its language. For ease of readability, we refer to the current statute throughout the opinion.

2. Because Swanson's injuries occurred while he was driving a motorcycle, the No–Fault Act does not apply. *See* Minn.Stat. § 65B.46, subd. 3 (2008).

and HealthPartners paid $17,643.76. The remaining amount, $43,445.74, was forgiven because the medical providers apparently discounted their medical services for Swanson as an insured of HealthPartners. It is undisputed that because HealthPartners was able to negotiate a discount on Swanson's behalf, the entire $62,259.30 amount was discharged and Swanson will never be responsible for the amount by which Swanson's medical bills were discounted.[3]

In anticipation of future litigation, State Farm paid HealthPartners $10,500 for HealthPartners' subrogation rights against whoever may be liable for Swanson's injuries. HealthPartners released and assigned to State Farm and the Brewsters

all subrogation rights which Health Partners [sic] shall have against any person or organization legally liable for the bodily injuries, if any, of David M. Swanson, and ... the full benefit of any collateral source offset which may be available in future litigation. We [(HealthPartners)] also release any claim against David M. Swanson.

In other words, State Farm purchased and now owns any right HealthPartners had to recover any money paid by HealthPartners on Swanson's behalf if Swanson was successful in recovering against another party through a tort action.[4]

Swanson commenced a tort action against Rebecca and Christopher Brewster for the personal injuries he sustained in the accident, alleging that Rebecca Brewster operated a motor vehicle negligently and that her negligence caused the accident and Swanson's injuries. The only issue to be decided at trial was the amount of Swanson's damages. On a special verdict form, the jury awarded Swanson $38,000 for past pain and suffering, $4,230 for past wage loss, $30,300 in future pain and suffering, and various amounts for specific past health care expenses that totaled $62,259.30. In all, the jury awarded $134,789.30 to Swanson.

After the district court received the jury's verdict, the Brewsters moved for a collateral-source determination under the collateral-source statute—Minn.Stat. § 548.251. Specifically, the Brewsters asked the court to reduce the damage award by contributions made by Swanson's health insurer, HealthPartners, including the negotiated discount HealthPartners secured from Swanson's medical providers. The court disagreed with the Brewsters' position and concluded that only the $17,643.76 paid by HealthPartners was a collateral source. In accordance with Minn.Stat. § 548.251, subd. 3, the court offset the $17,643.76 collateral-source amount by the amount Swanson paid in health insurance premiums during the two-year period leading up to the lawsuit— $4,570.64. See Minn.Stat. § 548.251, subds. 2, 3. As a result of this computation, Swanson's $134,789.30 verdict award was ultimately reduced by $13,073.12. The court also awarded Swanson costs and disbursements in the amount of $5,309.59 and pre-

---

3. Under certain contractual agreements between health insurers and medical providers, many medical providers agree to accept a reduced amount and to refrain from recovering more money from the patient. *See* Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits*, 21 Am. J. Trial Advoc. 453, 467 (1998).

4. State Farm purchased the subrogation right so that there would be no obstacle to securing a collateral-source reduction for amounts paid by HealthPartners on Swanson's behalf. *See* Minn.Stat. § 548.251, subd. 2(1) (excluding from collateral-source reductions those collateral sources for which a subrogation right has been asserted).

verdict interest in the amount of $7,496.32. The final judgment in Swanson's favor was $134,522.09 plus postverdict interest.

The Brewsters appealed the district court's order for judgment, arguing that the court erred by failing to classify the negotiated-discount amount as a collateral source and by failing to reduce Swanson's award by that amount. The Brewsters asserted that the court should have reduced Swanson's damage award by the entire amount of medical expenses billed ($62,259.30) less Swanson's health insurance premium payments ($4,570.64). The court of appeals affirmed the district court's collateral-source determination in an unpublished decision. *Swanson v. Brewster*, No. A08–806, 2009 WL 511747, at *1 (Minn.App. Mar. 3, 2009).

In its opinion, the court of appeals indicated that it was receptive to the Brewsters' argument, stating that the Brewsters' "assertion that the discharge of a debt may function in the same way as an actual expenditure of funds for purposes of the collateral source statute" was logical. *Id.* at *4. The court also acknowledged that failing to reduce damage awards by negotiated-discount amounts results in double recovery, undermining the purpose of the collateral-source statute. *Id.* But the court also noted that in two published opinions, it had held that negotiated-discount amounts are not collateral sources. *Id.* at *2–3 (discussing *Foust v. McFarland*, 698 N.W.2d 24 (Minn.App.2005), *rev. denied* (Minn. Aug. 16, 2005); *Tezak v. Bachke*, 698 N.W.2d 37 (Minn.App.2005), *rev. denied* (Minn. Aug. 24, 2005)).[5] The court then affirmed the district court's decision, relying on its prior published opinions. *Id.* at *4–5. The Brewsters appealed to our court and we granted review.

## I.

The only issue before us on appeal is whether a negotiated discount like the one HealthPartners negotiated with Swanson's medical providers is a collateral source under Minn.Stat. § 548.251 and should therefore be deducted from Swanson's damage award.

### Common–Law Collateral–Source Rule

When an individual or entity other than a tortfeasor compensates a tort plaintiff for his or her injuries, the plaintiff has received a "collateral-source benefit." Insurance coverage, job benefits, donations, and gratuitous services are examples of collateral-source benefits. *See Hueper v. Goodrich*, 314 N.W.2d 828, 830 (Minn. 1982); Dan B. Dobbs, *The Law of Torts* 1058 (2000). Under common law, the collateral-source benefits a plaintiff receives have no impact on a tortfeasor's responsibility to pay damages to the plaintiff. The substantive component of the common-law collateral-source rule states, "[A] plaintiff may recover damages from a tortfeasor, although the plaintiff has received money or services in reparation of the injury from a source other than the tortfeasor. The benefit conferred on the injured person from the collateral source is not credited against the tortfeasor's liability...." *Hueper*, 314 N.W.2d at 830 (citation omitted) (holding that defendant had to pay the entire costs of plaintiff's medical expenses even though a hospital provided plaintiff's medical care free of charge); *accord* Restatement (Second) of ·Torts § 920A

---

**5.** The court of appeals also acknowledged that at least one of its decisions, *Mikulay v. Dial Corp.*, No. C9–89–1711, 1990 WL 57530, *3 (Minn.App. May 8, 1990), held that negotiated discounts are collateral sources. *Swanson*,

2009 WL 511747, at *2. In *Mikulay*, the court reduced a tort plaintiff's damage award by the amount discounted through Medicare—an amount neither the patient nor government is required to pay. 1990 WL 57530, at *3.

(1979).[6] Accordingly, under the common-law collateral-source rule a tort plaintiff may receive more than the actual compensation amount—essentially a "double recovery"—because the tortfeasor must pay the entire compensation amount regardless of other compensation sources.[7] Ordinarily, there is an evidentiary component to the rule as well that "bars admission of evidence of the existence of the collateral source or the receipt of such benefits as irrelevant to the issue of damages, and liable to be misused by the jury." *Scott v. Garfield*, 454 Mass. 790, 912 N.E.2d 1000, 1011 (2009) (Cordy, J., concurring). The common-law collateral-source rule was applicable in Minnesota until 1986.

In 1986, the Minnesota Legislature passed the collateral-source statute in order to prevent some double recoveries by plaintiffs. *See* Act of Mar. 25, 1986, ch. 455, § 80, 1986 Minn. Laws 878, 878–79 (codified at Minn.Stat. § 548.251); *Imlay v. City of Lake Crystal*, 453 N.W.2d 326, 331 (Minn.1990) ("[T]he primary goal of [the collateral-source statute] is to prevent double recoveries by plaintiffs. . . ."). The statute changed the rule on collateral sources and damage awards, essentially providing that a plaintiff cannot recover money damages from the defendant if the plaintiff has already received compensation from certain third parties or entities. *See* Minn.Stat. § 548.251. Procedurally, the statute prevents double recovery through a post-trial reduction by the district court

of a plaintiff's award. Minn.Stat. § 548.251, subd. 3. The statute allows a party to file a motion requesting a determination of collateral sources after a jury returns a verdict awarding damages to a plaintiff. Minn.Stat. § 548.251, subd. 2. Upon receipt of such a motion, the court must determine:

(1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses except those for which a subrogation right has been asserted; and

(2) amounts that have been paid, contributed, or forfeited by, or on behalf of, the plaintiff or members of the plaintiff's immediate family for the two-year period immediately before the accrual of the action to secure the right to a collateral source benefit that the plaintiff is receiving as a result of losses.

Minn.Stat. § 548.251, subd. 2.

The collateral-source statute directs the court to "reduce the award by the amounts determined under subdivision 2, clause (1), and offset any reduction in the award by the amounts determined under subdivision 2, clause (2)." Minn.Stat. § 548.251, subd. 3(a). The court makes the reduction rather than the jury. To insure that the court determines the reduction, the statute prohibits the parties from informing the jury that the plaintiff has received compensa-

---

**6.** The Second Restatement of Torts describes the common-law collateral-source rule, as "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." Restatement (Second) of Torts § 920A.

**7.** The central justification for the common-law collateral-source rule is that a tortfeasor, as a wrongdoer who caused a particular harm, should not benefit from a tort plaintiff's

ability to secure other compensation. *See Hueper*, 314 N.W.2d at 830. For example, a tortfeasor's damage payment should not be decreased because a tort plaintiff had the foresight to purchase health insurance. *See id.* Likewise, if the benefit is a gift from a third-party donor, the tortfeasor should not benefit from the gift made to the tort plaintiff because "the donor intended that the injured party received the gift and not that the benefit be shifted to the tortfeasor." *Id.*

tion from another individual or entity. Minn.Stat. § 548.251, subd. 5.

Minnesota's collateral-source statute directly abrogates the common-law collateral-source rule to the extent that it allows a defendant, in certain situations, to reduce the damages he owes a plaintiff when a plaintiff has secured other compensation for his injury. But the collateral-source statute only partially abrogates the common-law collateral-source rule. Although compensation from any individual or entity other than the tortfeasor traditionally has been considered a collateral-source benefit, the collateral-source statute defines the phrase "collateral sources," and requires that compensation from a non-tortfeasor be deducted from a plaintiff's award if it fits within the statutory definition of collateral sources. The statute states:

> For purposes of this section, "collateral sources" means payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:
>
> (1) a federal, state, or local income disability or Workers' Compensation Act; or other public program providing medical expenses, disability payments, or similar benefits;
>
> (2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments;
>
> (3) a contract or agreement of a group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services; or

> (4) a contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability, except benefits received from a private disability insurance policy where the premiums were wholly paid for by the plaintiff.

Minn.Stat. § 548.251, subd. 1. Under the terms of the statute, a district court may reduce an award by amounts given to the plaintiff only by or pursuant to the four provisions listed in the statute. *See* Minn. Stat. § 548.251, subds. 2, 3.

*Negotiated Discounts and Other Jurisdictions*

Here, the question is whether a negotiated discount obtained by a plaintiff's health insurer is a "collateral source" as defined by subdivision 1(2) of the collateral-source statute. Before addressing negotiated discounts in the context of Minnesota's collateral-source statute, we first consider how negotiated discounts are treated in other jurisdictions. Several other jurisdictions have considered whether a plaintiff may recover a negotiated discount as an item of damages. The analyses and conclusions of these courts are varied. Courts in some jurisdictions that follow the common-law collateral-source rule have held that a discount is a collateral-source benefit, in essence treating it like a money payment delivered by an insurer to a healthcare provider on an insured's behalf. *See, e.g., Hardi v. Mezzanotte*, 818 A.2d 974, 983–85 (D.C.2003). In accordance with the common-law collateral-source rule's prohibition of reducing a plaintiff's award by a collateral-source benefit, these courts have held that the discount cannot be credited against the tortfeasor's liability; in other words, a plaintiff may recover the discount amount from the tortfeasor. *See, e.g., id.* Some of these courts also

explicitly state that a party may not introduce evidence that a plaintiff paid his health care provider a lower money amount than the amount billed. *See, e.g., Leitinger v. DBart, Inc.,* 302 Wis.2d 110, 736 N.W.2d 1, 18 (2007).

Courts in other jurisdictions that follow the common-law collateral-source rule have said that negotiated discounts are not collateral sources, and therefore allow defendants to introduce evidence of the amount of money an insurer delivers to a healthcare provider to satisfy a plaintiff's medical debt. *See Stanley v. Walker,* 906 N.E.2d 852, 858 (Ind.2009); *Robinson v. Bates,* 112 Ohio St.3d 17, 857 N.E.2d 1195, 1200 (2006). These courts do not require that the negotiated discount be deducted from a plaintiff's damage award; in other words, they do not preclude a plaintiff from recovering a negotiated discount. *See Robinson,* 857 N.E.2d at 1200 (declining to adopt a categorical rule that a plaintiff may *not* recover negotiated discounts and instead stating that "[t]he jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between"). These courts hold that a plaintiff is entitled to reasonable medical expenses and provide that "[b]oth the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care." *See id.* at 1200; *Stanley,* 906 N.E.2d at 858.

Other states, like Minnesota, have passed collateral-source statutes that have partially abrogated the common-law collateral-source rule. When faced with determining whether negotiated discounts are recoverable by plaintiffs, courts in states that have collateral-source statutes have interpreted their statutes and have endeavored to render decisions that are consistent with legislative intent. *See, e.g., Goble v. Frohman,* 901 So.2d 830, 833 (Fla. 2005); *White v. Jubitz Corp.,* 347 Or. 212, 219 P.3d 566, 580–83 (2009).

*Negotiated Discounts in the Context of the No–Fault Statute*

While we have not yet addressed the issue of a negotiated discount in the context of the collateral-source statute, we did address the issue in the context of the No–Fault Act in *Stout v. AMCO Insurance Co.,* 645 N.W.2d 108 (Minn.2002). Swanson cites *Stout* as authority for the district court's decision.

In *Stout,* a motor vehicle driver hit pedestrian Jason Stout. 645 N.W.2d at 109. The motor vehicle driver's no-fault insurer denied Stout's medical expense claim, arguing that an intentional act by the motor vehicle driver, rather than an accident, caused Stout's injuries. *Id.* In the meantime, Medicaid and MinnesotaCare paid medical assistance benefits on Stout's behalf, and his medical bills were discounted by $13,167.29 pursuant to Medicaid and MinnesotaCare fee schedules. *Id.* at 109–10. The district court found that the no-fault insurer improperly denied coverage and that Stout was entitled to basic economic loss benefits from the no-fault insurer. *See id.* at 110–11. The issue for our court on appeal was whether Stout's loss included the $13,167.29 negotiated discount. *Id.* at 112. We ultimately held that it did.

In *Stout,* we noted that under the No–Fault Act, loss is " 'economic detriment resulting from the accident causing the injury consisting only of,' among other things, 'medical expense,' " and that " '[l]oss accrues not when injury occurs, but as … medical … expense is *incurred.*' " *Id.* at 112 (emphasis added) (quoting Minn.Stat. § 65B.43, subd. 7 (2000); Minn.Stat. § 65B.54 subd. 1

(2000)). We concluded that a person incurs medical expenses as he receives bills for those expenses and that a later-negotiated discount does not modify the amount "incurred." *Id.* at 113. In other words, we concluded that Stout's loss, for purposes of the No–Fault Act, was the total amount billed rather than the amount tendered to Stout's health care provider to satisfy the bill because the total amount billed was the amount of the expenses incurred by Stout. *See id.* at 113–14.

We also concluded in *Stout* that it would be inappropriate for a court to reduce Stout's basic economic loss benefits by the negotiated-discount amount because the No–Fault Act did not provide for such a reduction. We explained that such a reduction would be "inconsistent with the Act's designation of basic economic loss benefits as primary and would violate the Act's prohibition of the coordination of benefits." *Id.* at 113. We concluded that holding a no-fault insurer responsible for the entire amount billed "remove[s] the incentive for no-fault insurers to delay the payment of meritorious claims in the hope that the injured person's health insurer will step in and pay his or her medical bills at a discounted rate." *Id.* at 114. For these reasons, we held in *Stout* that a no-fault insurer must provide basic economic loss benefits "even when the injured person is entitled to compensation for the same loss from a different source." *See id.* Accordingly, the no-fault insurer had to compensate Stout for the entire amount billed up to policy limits; Stout's damages were not reduced by the negotiated discount amount. *Id.; see also Collins v. Farmers Ins. Exch.*, 271 Minn. 239, 244–45, 135 N.W.2d 503, 507 (1965) (interpreting an insurance contract, specifically the word "incurred," to mean that the insurer who initially denied its insured's claim must pay the billed amounts, rather than the amount the insured actually paid his medical providers).

In *Foust v. McFarland,* one of the cases cited by Swanson to support his position, the court of appeals relied on *Stout* to conclude that courts should not deduct negotiated-discount amounts from a plaintiff's damage award under the collateral-source statute. 698 N.W.2d at 36.[8] As previously noted, Swanson urges us to do the same, asking us to adopt our reasoning from *Stout* and hold that a negotiated discount is not a collateral source. Swanson also emphasizes the general proposition in *Stout* that "if there is to be a windfall either to an insurer or to an insured, the windfall should go to the insured." *See Stout,* 645 N.W.2d at 114.

We conclude that the reasoning and outcome of *Stout* do not require us to adopt Swanson's preferred outcome in this case. In *Stout,* we interpreted the No–Fault Act. But here we are dealing with the collateral-source statute, which is different from the No–Fault Act in form, purpose, and function.

First, the form of the two statutes is different. The No–Fault Act is part of a comprehensive legislative scheme. The phrases and words "economic loss benefits," "medical expense," and "incurred"

---

8. In *Foust,* the tortfeasor asked for a collateral-source determination at the district court level and appealed when the district court did not reduce the damage award by $72,481.27, the negotiated discount amount. 698 N.W.2d at 35. The court of appeals explained that it found "the purpose behind both [the no-fault and collateral-source] statutes to have similarities," and relied on *Stout* to conclude a negotiated discount is not a collateral source. *Id.* at 36. The court also observed that a collateral-source deduction for the negotiated discount was not appropriate because neither the plaintiff nor his insurance company "paid" those amounts. *Id.* at 36.

from the No–Fault Act at issue in *Stout*, are not at issue in our analysis here of the collateral-source statute. Instead, in this case, "collateral source" and "payment" are at issue and their use is instructive to resolving the question before us.

■ Second, the purpose and function of the two statutes are different. The purpose of the collateral-source statute "is to prevent double recoveries by plaintiffs," *Imlay*, 453 N.W.2d at 331, while one of the goals of the No–Fault Act is to ensure that automobile-accident victims are promptly compensated for their loss, *see* Minn.Stat. § 65B.42(1) (2008); *Do v. American Family Mutual Insurance Co.*, 779 N.W.2d 853, 857 (Minn.2010). To this end, the No–Fault Act encourages the prompt payment of claims, *Schmidt v. Clothier*, 338 N.W.2d 256, 260 (Minn.1983), in part by making no-fault insurers the primary source of benefits for those injured in automobile accidents and prohibiting the coordination of basic economic loss benefits, *Stout*, 645 N.W.2d at 112–13. In *Stout*, we were concerned that reducing damage awards by the negotiated discount would encourage no-fault automobile insurers to withhold benefits until a plaintiff's health insurer has negotiated with medical creditors. *Stout*, 645 N.W.2d at 114. We concluded that such a practice would contravene one of the purposes of the No–Fault Act, which is " '[t]o encourage appropriate medical and rehabilitation treatment of the automobile accident victim by assuring prompt payment for such treatment.' " *Id.* (quoting Minn.Stat. § 65B.42(3) (2000)).

Swanson argues that reducing his damage award by the negotiated-discount amount in a tort suit engenders the same concern we addressed in *Stout*. More particularly, he asserts that reducing his damage award would encourage tortfeasors to deny liability and protract litigation in order to force a tort plaintiff or his health insurer to pay medical expenses and likely negotiate a discount. Swanson's reasoning is flawed. While a no-fault insurer's legal liability arises at the time of an accident, a tortfeasor does not have the same immediate responsibility to pay a tort plaintiff's medical expenses. A plaintiff or his health insurer pays any medical bills, and an alleged tortfeasor pays damages only if found liable. Because a tortfeasor would likely get the benefit of any discount whether he settles or litigates, concluding that negotiated discounts are collateral sources would not encourage a tortfeasor to litigate. In contrast, under the no-fault scheme there need only be a determination of which automobile insurer must directly pay economic loss benefits, including medical expenses; a determination of fault is unnecessary. Reducing an award by the negotiated discount in the collateral-source context does not raise the same concern as a situation governed by the No–Fault Act.

Because the form, purpose, and function of the No–Fault Act and collateral-source statute are different, we conclude that our reasoning in *Stout* is not controlling for our interpretation of Minn.Stat. § 548.251. Therefore, our analysis of Minn.Stat. § 548.251 and our determination of whether a negotiated discount is a "collateral source" under the collateral-source statute must focus on an interpretation of the words used in that statute.

*Minnesota's Collateral–Source Statute*

The Minnesota Legislature enacted Minn.Stat. § 548.251 to control the treatment of collateral sources in cases such as this. The collateral-source statute defines "collateral sources" as "payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to ... health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits."

Minn.Stat. § 548.251, subd. 1. Swanson argues that this language in the collateral-source statute is unambiguous, and that negotiated discounts are not collateral sources under the statute. He points out that collateral sources are defined as "payments" and asserts that "payment" clearly means "an amount paid." According to Swanson, money given in exchange for goods or services is "an amount paid," but the forgiveness of debt is not "an amount paid" and therefore a negotiated discount is not a payment. Swanson concludes that because a negotiated discount is not a payment, the district court's collateral-source determination was correct and that the Brewsters are not entitled to any further reduction of the damage award.

The Brewsters argue that the collateral-source statute is unambiguous, but assert that while the plain meaning of payment includes amounts of money given, it also includes amounts "written off or discharged" because the words payment and pay include the concept of discharging of a debt. In the alternative, the Brewsters argue that if the collateral-source statute is ambiguous, the legislative history of the statute—that the Legislature was attempting to address the insurance liability crisis through tort reform—suggests that negotiated discounts are collateral sources. Based on either approach—an unambiguous or ambiguous statute—it is the Brewsters' position that the district court erred when it failed to reduce Swanson's award by the discount HealthPartners negotiated on Swanson's behalf.

 "When construing a statute, our goal is to ascertain and effectuate the intention of the legislature." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 278 (Minn.2000). In *Schroedl,* we declared that courts are "to construe words and phrases according to their plain and ordinary meaning." *Id.* at 277; *accord* Minn.

Stat. § 645.08 (2008) ("[W]ords and phrases are construed according to rules of grammar and according to their common and approved usage. . . ."). Also, "[a] statute should be interpreted, whenever possible, to give effect to all of its provisions." *Schroedl,* 616 N.W.2d at 277. A court must "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Id.* And, finally, "courts should construe a statute to avoid absurd results and unjust consequences." *Id.* at 278.

 The first step in any statutory interpretation is to determine if the statute is clear and unambiguous. *Id.* at 277. If the statute's language is unambiguous, we must give it its plain meaning. *Wynkoop v. Carpenter,* 574 N.W.2d 422, 425 (Minn. 1998). If the statute's language is ambiguous, the court may "look outside the statutory text to ascertain legislative intent." *Id.;* *see also* Minn.Stat. § 645.16 (2008). A statute's meaning is ambiguous if it is subject to more than one reasonable interpretation. *Schroedl,* 616 N.W.2d at 277.

Given the foregoing mandate, we proceed to analyze the collateral-source statute to determine whether the meaning of "collateral sources" is unambiguous. The statute specifically defines the term "collateral sources" as "payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf, up to the date of the verdict by or pursuant to . . . health . . . insurance." Minn.Stat. § 548.251, subd. 1. The statute also directs courts to determine "amounts of collateral sources that have been *paid* for the benefit of the plaintiff *or are otherwise available* to the plaintiff as a result of losses." Minn.Stat. § 548.251, subd. 2(1) (emphasis added). The words "payment" and "paid" are not defined in the statute, nor does the

statute expand upon the phrase "otherwise available."

*Black's Law Dictionary* defines "payment" as both (1) the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation" and (2) "[t]he money or other valuable thing so delivered in satisfaction of an obligation." *Black's Law Dictionary* 1243 (9th ed. 2009). The *American Heritage Dictionary* defines "payment" as (1) "[t]he act of paying or the state of being paid," and (2) "[a]n amount paid." *The American Heritage Dictionary of the English Language* 1292 (4th ed. 2000). According to the *American Heritage Dictionary* the word "pay" can mean "[t]o give money to in return for goods or services rendered," "[t]o give (money) in exchange for goods or services," or "[t]o discharge or settle (a debt or an obligation)." *Id.* at 1291.

The Brewsters argue that because the words "pay" and "payment" include the idea of discharging or satisfying a debt, a negotiated discount is a collateral source. Based on the foregoing definitions, we agree with the Brewsters that the ordinary and plain meaning of the words "pay" and "payment" include the idea of discharging or satisfying a debt. But the fact that the words "pay" and "payment" include the *idea* of discharging a debt does not mean that a negotiated discount is a "payment" as the word is used in the collateral-source statute. Accordingly, we must conduct a more penetrating analysis of the meaning of the word "payment" in the context of the statute.

When conducting such an analysis we have little difficulty in coming to the conclusion that the plain and ordinary meaning of the word payment is broader than the narrow meaning advocated by Swanson. Swanson argues that only money given in exchange for goods or services is a "payment." But, as *Black's Law Dictionary* states, a payment may be something other than cash; it is "[t]he money or *other valuable thing* so delivered in satisfaction of an obligation." *Black's Law Dictionary* 1243 (emphasis added). Here, HealthPartners delivered another valuable thing to Swanson's medical providers in order to satisfy Swanson's debt; i.e., the medical providers did not gratuitously agree to accept $17,643.76 as full satisfaction for Swanson's $62,259.30 in medical bills. It appears that HealthPartners and the medical providers had some type of understanding that in exchange for HealthPartners referring its policyholders to them, they would provide medical services at a discount to these policyholders. Each party to such an understanding would gain something valuable. The medical providers would not have discounted Swanson's bills absent an agreement with HealthPartners. Therefore, we conclude the negotiated discount was a payment because it involved the exchange of things of value to discharge Swanson's medical bill contractual obligations.

In addition to being a "payment" under the ordinary and plain meaning of that word, a negotiated discount also satisfies the other statutory requirements to qualify as a collateral source: that the payment is "related to the injury or disability in question" and that the payment is made on the plaintiff's behalf pursuant to a health insurance policy. The statute specifically provides that " 'collateral sources' means payments related to the injury or disability in question made . . . on the plaintiff's behalf . . . pursuant to . . . health . . . insurance." Minn.Stat. § 548.251, subd. 1. HealthPartners satisfied Swanson's medical debts with the delivery of money and the negotiation of a discount because the medical providers provided medical care to Swanson after he was injured in the acci-

dent caused by Rebecca Brewster. Accordingly, the discount was secured in relation to the injury in question.

As to whether the discount was paid on Swanson's behalf, the Supreme Court of Florida addressed this point in *Goble*, 901 So.2d at 833. In *Goble*, the Florida court interpreted a collateral-source statute similar to Minnesota's [9] in the context of a motorcycle accident and explained that:

> Because of the medical providers' contracts with [the tort plaintiff's] HMO, [the tort plaintiff] was obligated to pay the claimants $145,970.76, rather than the billed charges of $574,554.31. In this light, the discounts negotiated by [the tort plaintiff's] HMO are as much a benefit to [the tort plaintiff] as the HMO's remittance of $145,970.76 to satisfy the remaining charges on [the tort plaintiff's] medical bills.

*Id.* at 833; *see also Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 322 (2000) ("Those amounts written off are as much of a benefit ... as are the actual cash payments made by his health insurance carrier to the health care providers.").

We agree with the Florida court's analysis in *Goble* and conclude it applies to the facts of this case.[10] The discount secured by HealthPartners was as much a benefit to Swanson as the $17,643.76 HealthPartners tendered to Swanson's medical providers, because the delivery of money did not alone satisfy Swanson's medical debt. HealthPartners tender of $17,643.76 to the medical providers plus the discount it negotiated with the medical providers relieved Swanson of his obligation to pay the total amount of his medical bills, which amounted to $62,259.30. Based on our foregoing analysis, we conclude that the discount HealthPartners secured through its agreements with the medical providers is a type of payment, the payment is related to Swanson's injury or disability, and the payment was made on Swanson's behalf pursuant to a health insurance policy. *See* Minn.Stat. § 548.251, subd. 1. Therefore, we conclude that the negotiated discount is unambiguously a collateral source for purposes of the collateral-source statute.[11]

**9.** Florida's collateral-source statute, passed in 1986, states, " 'Collateral sources' means any payments made to the claimant, or made on the claimant's behalf, by or pursuant to ... [a]ny health, sickness, or income disability insurance," and "the court shall reduce the amount of such award by the total of all amounts which have been paid for the benefit of the claimant, or which are otherwise available to the claimant, from all collateral sources." Fla. Stat. § 768.76 (2009).

**10.** The dissent correctly asserts that we rely on the Florida Supreme Court's analysis in *Goble*, a case in which the Florida court interpreted a collateral-source statute similar to ours. But it is important to note that while the Florida opinion is broadly written we limit our use of that opinion to provide analytical support for our conclusion that the negotiated discount secured by HealthPartners was obtained on Swanson's behalf. The Florida court in *Goble* also concluded that negotiated discounts were payments and

therefore collateral sources under its collateral-source statute. Nevertheless, the dissent incorrectly makes a claim that the special concurrence of three of the justices of the Florida Supreme Court undermines the significance of the majority's analysis. This is not the case. The special concurrence supports the analysis of the whole court and concludes that "[t]he contractual discounts negotiated by [the tort plaintiff's] HMO fall under the statutory definition of 'collateral sources' that are to be set off against an award of compensatory damages." *Goble*, 901 So.2d at 833 (Bell, J., specially concurring). The special concurrence simply points out that the result would be the same under its interpretation of common-law compensatory-damages principles because negotiated discount sums are not a proper item of actual damages. *Id.*

**11.** The dissent's statement that the majority "ignores the Legislature's specific use of the word 'payments' in Minn.Stat. § 548.251,

Our conclusion that a negotiated discount is a collateral source for purposes of the collateral-source statute is consistent with our case law. Swanson urges us to apply the reasoning in *Stout* to this case, but some language in *Stout* actually appears to contradict Swanson's position. Swanson argues that money payments and negotiated discounts are fundamentally different; but in *Stout*, we pointed out that a negotiated discount is not substantively different from a money payment. *See Stout*, 645 N.W.2d at 114. In holding that neither a negotiated discount secured by an insurer nor a money payment made by an insurer could be deducted from the no-fault insurer's obligation, we explained, "Although the forms of the two transactions may differ, we find it more important that, from the standpoint of the no-fault insurer, their substance is the same." *Id.* Other courts have drawn similar conclusions. One court stated, "[F]or purposes of the collateral source rule, no rational distinction exists" between money payments made by an insurer on behalf of a plaintiff and a healthcare provider's negotiated discounts made pursuant to contractual relationships. *Lopez v. Safeway Stores, Inc.*, 212 Ariz. 198, 129 P.3d 487, 495 (2006); *see also Mitchell v. Haldar*, 883 A.2d 32, 40 (Del.2005); *Brown v. Van Noy*, 879 S.W.2d 667, 676 (Mo.Ct.App. 1994) ("[T]he fact that the expenses were 'taken care of' by Medicare is not materially different than expenses paid by insurance or paid in part by insurance with part 'written off' pursuant to a contract or agreement between the medical provider and the insurance company."). Courts in the foregoing cases interpreted and applied the common-law collateral-source rule and held that plaintiffs could recover the full amount billed by their health care provider. Nevertheless, the legal analysis used by the courts in these cases supports our conclusion in *Stout* that the "substance [of the two transactions] is the same."

In addition, other parts of the collateral-source statute support our conclusion that the term "collateral source" unambiguously includes a negotiated discount. Our case law provides that we are to read and construe statutes as a whole. *See Schroedl*, 616 N.W.2d at 277. When we read and construe the collateral-source statute as a whole and interpret each section in light of the surrounding sections, it appears that Swanson's argument limiting the meaning of collateral source to "money delivered" is too narrow an interpretation for at least three reasons.

First, the collateral-source statute provides that collateral sources are "payments ... made ... pursuant to ... a contract or agreement of a group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services." Minn.Stat. § 548.251, subd. 1(3). As a preliminary issue, we conclude the phrase "the costs of" modifies the word "reimburse" but not the word "provide" or the phrase "pay for." While one can "provide" or "pay for" health care services, one cannot "reimburse" health care services; one must "reimburse the costs of" health care services. Moreover, if the phrase "the cost of" modifies "provide," "pay for," and "reimburse" the statute would be redundant because there is no difference between providing the costs of health care and paying for the cost of healthcare. Therefore, the phrase "the costs of" modifies only the word "reimburse." Because the phrase "the costs of" modifies only the

subd. 1," *infra* at D–10, is unfounded in light of the statutory analysis just completed. *See* slip op. at 18–23. We rely on that analysis to

refute the dissent's assertion that we have ignored the specific language used by the legislature.

word "reimburse," this clause in the statute demonstrates that the "provision" of hospital, medical, dental or other health care services is a collateral source. Minn. Stat. § 548.251, subd. 1(3). Therefore, we conclude the Legislature intended that the word payment be interpreted broadly because the statute states that the provision of health care services is a collateral source even though it is not the delivery of money "to the plaintiff, or on the plaintiff's behalf."

Second, subdivisions 2(1) and 3 of the collateral-source statute specifically instruct a district court to reduce the damage award by "collateral sources that have been paid for the benefit of the plaintiff or are *otherwise available* to the plaintiff." Minn.Stat. § 548.251, subds. 2(1), 3 (emphasis added). The phrase "otherwise available" indicates that defining the phrase "collateral sources" as "money delivered to a creditor" is too narrow because this provision of the statute suggests that collateral sources can be money payments *or* can be otherwise available. We conclude that other interpretations would render the words "otherwise available" superfluous and conflict with the rule that a statute be construed "to give effect to all its provisions."[12] *See* Minn.Stat. § 645.16. The discount HealthPartners negotiated with Swanson's medical providers on his behalf was not "paid" to Regions as a money tender, but it was "otherwise available" to Swanson because Swanson was

able to use that discount to satisfy part of his medical debt. Therefore, we conclude that the $43,445.74 negotiated discount is a collateral source because it was "otherwise available" to Swanson.

Third, we conclude that our interpretation of the collateral-source statute effectuates the intention of the Legislature. *See* Minn.Stat. § 645.16. We have said that the Legislature specifically intended to abrogate in part the common-law collateral-source rule by "prevent[ing] double recoveries in many circumstances." *See Imlay,* 453 N.W.2d at 331. In passing the collateral-source statute, the Legislature ended certain double recoveries for plaintiffs. *See* Minn.Stat. § 548.251, subds. 1–3. Though the Legislature specifically excluded some traditional collateral-source benefits, such as gifts from family members, from the statute's definition of collateral sources, *see* Minn.Stat. § 548.251, subds. 2(2), 3, it specifically included payments made to a plaintiff pursuant to that plaintiff's health insurance policies, *see* Minn. Stat. § 548.251, subd. 1(2). The plain language of the statute demonstrates that while the Legislature intended to maintain the common-law collateral-source rule in instances of familial gifts, the Legislature intended to abrogate the rule in instances of coverage of the plaintiff's health insurance. *See* Minn.Stat. § 548.251, subd. 1(2). Swanson has not offered any principle or reason why the Legislature would treat the two types of insurer compensation—

12. An alternative interpretation appears to avoid rendering "otherwise available" superfluous—that collateral sources "otherwise available" refers to a money tender that is available to the plaintiff but has not yet been physically delivered. But this interpretation is inconsistent with other provisions of the collateral-source statute and is flawed because a collateral source is a payment "made to the plaintiff, or on the plaintiff's behalf *up to the date of the verdict.*" *See* Minn.Stat. § 548.251, subd. 1 (emphasis added). In oth-

er words, a third party contribution is only a collateral source under the statute if it occurs before a verdict is issued. We conclude that interpreting collateral sources that are "otherwise available" to mean "money that has not yet been delivered" is unreasonable because, according to the statute, money that has not yet been delivered by the time of the collateral-source determination—which occurs post-verdict—cannot be a collateral source.

negotiated discounts and money payments—differently. In other words, Swanson has not explained why the Legislature would allow damage-award reductions by amounts of money an insurer pays for health care services on the plaintiff's behalf, but not allow damage-award reductions by discounts negotiated by an insurer for health care services on the plaintiff's behalf.

Swanson asserts that an application of the common-law collateral-source rule is appropriate in this instance because he had the foresight and prudence to secure health insurance and he paid premiums for his policy with HealthPartners that in turn allowed him to receive discounted services. But the Legislature provided that a plaintiff's health insurance coverage is a collateral source for purposes of the collateral-source statute even though it was aware that plaintiffs often pay premiums for that insurance. *See* Minn.Stat. § 548.251, subd. 1(2). And the Legislature accounted for premium payments in subdivisions 2(2) and 3 of the statute, requiring district courts to offset any collateral-source reduction of an award by the amount of premiums paid by that plaintiff or the plaintiff's family. Because it appears that the Legislature intended to abrogate the common-law collateral-source rule in cases of benefits derived from a plaintiff's health insurance policy, it would be an absurd result to allow collateral-source deductions for money paid by a plaintiff's health insurer but not for the amount an insurer negotiates as a discount.[13]

The consequences of interpreting the statute to mean negotiated discounts are not collateral sources as defined by Minn. Stat. § 548.251 would be that Swanson would recover a sum of money based on a portion of his medical bills that he never paid and never will have to pay. Moreover, the medical bills themselves might not be a true measure of the reasonable value of Swanson's injury. One commenter points out that negotiated discounts are now common and asks, "If most [medical] providers in the community accept the same or similar 'paid charge' in full satisfaction of their claims, can it still be honestly suggested that the 'billed charge' is reasonable?" Beard, *supra*, at 457; *see also Stanley*, 906 N.E.2d at 857 ("Currently, the relationship between charges and costs is 'tenuous at best.' "). The consequence of Swanson's interpretation appears to contravene the intent of the Legislature by requiring the Brewsters to compensate Swanson for a loss he did not suffer, or by permitting "double recovery." Again, given our conclusion that the Legislature intended to abrogate the common-law collateral-source rule in cases of health insurance benefits, *see* Minn.Stat. § 548.251, subd. 1(2), it would be inconsistent to allow courts to make deductions from an award for money paid by health insurers but not for the amounts an insurer negotiates as discounts. Accordingly, we conclude that interpreting the statute to include negotiated discounts as collateral sources is consistent with the intention of the Legislature.

Swanson argues that broad interpretation of the phrase "collateral sources" is inappropriate because the collateral-source statute is in derogation of the common law and therefore we are to construe the statute strictly, limiting the statute's application to those instances where the Legislature expressly declares or clearly indicated

---

**13.** The dissent's characterization of our opinion as holding "the statute applies 'in cases of benefits derived from a plaintiff's health insurance policy' " is refuted when the foregoing paragraph is read completely and in context, rather than through the excerpt used by the dissent.

it abrogated the common law rule. *See Rosenberg v. Heritage Renovations, LLC,* 685 N.W.2d 320, 328 (Minn.2004). Though it is true that we must strictly construe the collateral-source statute because it is in derogation of the common law, *see id.* at 327–28, it is also true that we should not so narrowly construe statutes that we disregard the Legislature's intent, *Maust v. Maust,* 222 Minn. 135, 139, 23 N.W.2d 537, 540 (1946). Our construction of the statute must be sensible and in harmony with the statute's purpose. *See Maust,* 222 Minn. at 139, 23 N.W.2d at 540.[14] The collateral-source statute is designed to address instances when a third party—such as the government, an insurance company, or an organization—discharges a tort plaintiff's medical debts whether by a money payment or otherwise. *See* Minn.Stat. § 548.251, subd. 1(1)-(3). We conclude that the Legislature clearly indicated that it intended to abrogate the common-law collateral-source rule in instances of compensation by a plaintiff's health insurer, including discounts negotiated by that insurer and secured on the plaintiff's behalf. *See Rosenberg,* 685 N.W.2d at 328. We cannot and should not lessen the scope of the statute beyond what the Legislature intended. *See Maust,* 222 Minn. at 139, 23 N.W.2d at 540.

The dissent asserts that to "deny[ ] the plaintiff the benefit of a negotiated insurance discount represents a distinct minority view among state courts that have considered the issue." *Infra* at D–8. In an effort to support this statement, the dissent cites several cases from other jurisdictions in which other courts have con-

cluded that a negotiated discount should not be deducted from a damage award. But these cases do not provide support for the dissent's assertion that our decision "represents a distinct minority view." We do not believe that the dissent can fairly categorize our opinion as a "distinct minority" because we are interpreting a law different from the law being interpreted by the 16 courts cited by the dissent.

The dissent also fails to note and explain that in 15 of the 16 cases it lists, the courts interpreted and applied the common-law collateral-source rule, not a collateral-source statute. As explained earlier, the common-law collateral-source rule states that collateral sources may not be deducted from a plaintiff's damages award. Courts in these 15 cases determined that money given to a medical provider by a third party and negotiated discounts are both collateral sources and are recoverable by a plaintiff. Though we have never before addressed the foregoing question, we acknowledge that it is possible that we could have come to a similar conclusion as these 15 courts if Minnesota still followed the common-law collateral-source rule in its entirety. But this is not the case here, because Minnesota no longer strictly adheres to the common-law collateral-source rule in its entirety. In 1986, our Legislature passed a collateral-source statute that modifies the common-law collateral-source rule, and we must interpret that statute to see how it applies in this case.

The sixteenth case cited by the dissent was decided by the Oregon Supreme Court. *White,* 347 Or. 212, 219 P.3d 566.

---

**14.** In *Maust v. Maust,* we explained:

Although a rule of strict construction is applied to a statute in derogation of the common law, it should nevertheless be construed sensibly and in harmony with the purpose of the statute, so as to advance and render effective such purpose and the inten-

tion of the legislature. The strict construction should not be pushed to the extent of nullifying the beneficial purpose of the statute, or lessening the scope plainly intended to be given thereto.

222 Minn. at 139, 23 N.W.2d at 540 (citation omitted) (internal quotation marks omitted).

Oregon has a collateral-source statute, but it specifically provides that insurance benefits may not be deducted from a damage award. *See id.* at 578, 580; Or.Rev.Stat. § 31.580 (2009). Because the Minnesota collateral-source statute provides the opposite, the Oregon case is not helpful in determining whether negotiated discounts should be deducted from a plaintiff's damage award in Minnesota.[15]

Similarly, the Minnesota cases cited by the dissent, *Dahlin v. Kron,* 232 Minn. 312, 320, 45 N.W.2d 833, 837 (1950), and *Dyson v. Schmidt,* 260 Minn. 129, 140, 109 N.W.2d 262, 269 (1961), are not dispositive because they were decided when Minnesota followed the common-law collateral-source rule in its entirety, i.e., before 1986 when the Legislature passed the collateral-source statute. Further, we note that the Eighth Circuit case *Ince v. Aetna Health Management, Inc.,* 173 F.3d 672, 676 (8th Cir.1999), quoted by the dissent cites *Dahlin* as its authority. While *Dahlin, Dyson,* and *Ince* may correctly state that the measure of damages for past medical expenses is the reasonable value of the services received, they do not provide support for the conclusion that a negotiated discount should not be deducted from a plain-

tiff's damage award under the collateral-source statute. These cases were decided, or rely on a case that was decided, before Minnesota's collateral-source statute was enacted.

The dissent also notes that the jury found that a $62,259 damage award fairly and adequately compensates Swanson for his past medical expenses, and argues that we are not free to second-guess that finding. *Infra* at D–11. The dissent in an earlier footnote, *infra* at D–7 n. 3, cites *Robinson,* 857 N.E.2d at 1200, an Ohio case that explains that both an original medical bill and the amount accepted as full payment could be used to prove the reasonable value of medical services. The dissent is mistaken if it is attempting to suggest that the jury considered the money amount accepted in full satisfaction of Swanson's original bill to determine the reasonableness of the cost of Swanson's medical services, or that juries in future cases could determine reasonableness of damage amounts if the defendant introduces the amount of money used to discharge an original medical bill. Under Minnesota's collateral-source statute, "[t]he jury shall not be informed of the

---

15. The dissent uses the terms "strained" and "blatant[] disregard" in reference to our analysis. We do not believe the terms are appropriate to describe our analysis. Moreover, we find the dissent's use of these terms to be particularly inappropriate given the dissent's use of several cases at *infra* D–8 n. 5 that at best provide questionable support for its conclusion. Neither *Jones v. Kramer,* 267 Conn. 336, 838 A.2d 170 (2004), *Allstate Insurance Co. v. Rudnick,* 761 So.2d 289 (Fla. 2000), nor *Oden v. Chemung County Industrial Development Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 661 N.E.2d 142 (1995), address the issue of negotiated discounts. In *Jones,* for example, the issue was whether Connecticut's collateral-source statute "requires the trial court to deduct all collateral source payments from the plaintiff's economic damages award, or only those payments that were allo-

cated to the specific items of damages actually included within the fact finder's verdict." 838 A.2d at 172. The Connecticut Supreme Court, attempting to avoid "constru[ing] the statute in a way that would thwart its purpose" concluded "only payments specifically corresponding with items of damages included in the jury's verdict [can] be deducted as collateral sources from the economic damages award." *Id.* at 177; *cf. Oden,* 637 N.Y.S.2d 670, 661 N.E.2d at 145 ("[O]nly those collateral source payments that actually replace a particular category of awarded economic loss may be used to reduce the injured's judgment.") The Connecticut court did not address negotiated discounts. *Jones,* 838 A.2d at 177.; *see also Allstate,* 761 So.2d at 293 (holding that benefits potentially payable in the future are not collateral sources); *Oden,* 637 N.Y.S.2d 670, 661 N.E.2d at 145.

existence of collateral sources or any future benefits which may or may not be payable to the plaintiff." Minn.Stat. § 548.251, subd. 5.

Given that the dissent properly notes that the admissibility of a negotiated discount is not an issue in this case, it is also proper in the context of the dissent's assertion to note that the collateral-source statute suggests that while evidence of the medical bills incurred by the plaintiff is admissible, evidence of what a health insurer paid on a plaintiff's behalf, and the fact that it is less than the amount billed, cannot be considered by a jury. *See* Minn. Stat. § 548.251, subd. 5; *see also Leitinger*, 736 N.W.2d at 14 (explaining that though a rule allowing the admission of evidence regarding of the amount of money actually used to satisfy a medical bill is appealing, the evidence would confuse the jury, and the plaintiff's attempts to explain the compromised payment would necessarily lead to the existence of a collateral source).

We conclude that negotiated-discount amounts—amounts a plaintiff is billed by a medical provider but does not pay because the plaintiff's insurance provider negotiated a discount on the plaintiff's behalf—are "collateral sources" for purposes of the Minnesota collateral-source statute, Minn. Stat. § 548.251. We therefore hold that the district court erred in its collateral-source determination because it failed to classify the amount by which Swanson's medical providers discounted Swanson's medical bills as a collateral source. Because of Swanson's accident with Rebecca Brewster, Swanson's medical expenses totaled $62,259.30. After Swanson's copayments of $1,169.80, $61,089.50 in charges remained. Because the money HealthPartners delivered to the medical providers ($17,643.76) combined with the negotiated discount ($43,445.74) fully satisfied Swanson's remaining $61,089.50 obligation, the total amount of "collateral sources that have been paid for the benefit of [Swanson] or are otherwise available to [Swanson]" is $61,089.50 for purposes of Minn.Stat. § 548.251, subd. 2(1). As required by Minn.Stat. § 548.251, subd. 3, the district court on remand should also offset the collateral-source amount—$61,089.50—by $4,570.64, the total of Swanson's health insurance premium payments for the two-year period immediately before this action. Accordingly, the district court on remand should reduce Swanson's damage award by the amount of $56,518.86.

Reversed and remanded to the district court.

Concurring, DIETZEN, J.

Dissenting, MEYER and PAGE, JJ.

Took no part, ANDERSON, G. BARRY, J.

MEYER, Justice (dissenting).

I respectfully dissent. Contrary to our longstanding rules of statutory interpretation that require a strict construction of statutes in abrogation of the common law, the majority adopts an expansive interpretation of the word "payments" in the collateral-source statute, Minn.Stat. § 548.251 (2008), which extends beyond the plain meaning to a negotiated discount between the plaintiff's insurance company and his medical providers. I interpret "payments" according to its plain and ordinary meaning to exclude the amount of a write-off that no one has paid. Thus, I would hold that the injured plaintiff who procured the insurance coverage is entitled to the benefit of the discount, not the tortfeasor who caused the injury.

In a personal injury action, the measure of damages for past medical expenses is the reasonable value of medical services

received. *See Dahlin v. Kron,* 232 Minn. 312, 320, 45 N.W.2d 833, 837 (1950). We never have required an injured party to have paid the full value of medical services for the tortfeasor to be liable for those services. *See Dyson v. Schmidt,* 260 Minn. 129, 140, 109 N.W.2d 262, 269 (1961) (noting that "the test of recoverability in damages" in Minnesota does not depend upon "whether or not medical bills have been paid"). As the Eighth Circuit Court of Appeals has observed, "Minnesota law has long provided that an injured party may recover from a tortfeasor the 'reasonable value' of medical services received, even if the injured party acquired the services for less." *Ince v. Aetna Health Mgmt., Inc.,* 173 F.3d 672, 676 (8th Cir. 1999).

Under the common-law collateral-source rule, the fact that some or all of a plaintiff's medical expenses were paid by an independent source does not prevent the plaintiff from recovering those same medical expenses from a tortfeasor. *See Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 331 (Minn.1990). The collateral-source rule applies in a variety of contexts, including "insurance proceeds, employment benefits, gifts of money or medical services, welfare benefits or tax advantages." *Hueper v. Goodrich,* 314 N.W.2d 828, 830 (Minn.1982) (medical services provided free of charge); *see, e.g., Van Tassel v. Horace Mann Ins. Co.,* 296 Minn. 181, 188–89, 207 N.W.2d 348, 352–53 (1973) (insurance); *Local 1140, Int'l Union of Elec., Radio & Mach. Workers v. Mass. Mut. Life Ins. Co.,* 282 Minn. 455, 459, 165 N.W.2d 234, 236–37 (1969) (donated blood); *Dyson,* 260 Minn. at 140, 109 N.W.2d at 269 (workers' compensation benefits). The common-law collateral-source rule also applies in the context of a negotiated discount of medical bills. *See, e.g., Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 322–23 (2000) (explaining that portions of medical expenses that health care providers wrote off constitute compensation from a source collateral to the tortfeasor).

We have noted multiple rationales for the common-law collateral-source rule. One rationale is that when a plaintiff has paid for a benefit, for example, by purchasing insurance, he "should be reimbursed and the tortfeasor should not get a windfall." *Hueper,* 314 N.W.2d at 830. We also have explained that insurance covering an injured party "is not a fact which lessens the liability of a defendant for a tort." *Solberg v. Minneapolis Willys–Knight Co.,* 177 Minn. 10, 12, 224 N.W. 271, 272 (1929); *accord Donohue v. Acme Heating Sheet Metal & Roofing Co.,* 214 Minn. 424, 426, 8 N.W.2d 618, 619 (1943) (stating that a defendant "cannot escape liability for his wrong because of insurance" carried for the protection of the plaintiff). In the context of an insurance write-off, the collateral-source rule dictates that the benefit of the reduced payment "inures solely to the plaintiff," not the tortfeasor who caused the injury. *Koffman v. Leichtfuss,* 246 Wis.2d 31, 630 N.W.2d 201, 210 (2001). Simply put, "Wrongdoers are not allowed the luxury of a discount on the basis of the injured's good fortune in having secured insurance or other financial assistance." Fred Lane & Scott Lane, 1 *Lane Goldstein Trial Technique* § 2:106 (3d ed. 2009).

The issue here concerns the reach of Minnesota's collateral-source statute, Minn.Stat. § 548.251. The collateral-source statute changed the common law by allowing a tortfeasor to reduce a damages award by the amount the plaintiff received from certain "collateral sources" enumerated in the statute. *See* Minn.Stat. § 548.251, subd. 1 (defining "collateral sources"). Specifically, we must determine whether a negotiated discount of a

medical bill falls within the statutory definition of "collateral sources."

The collateral-source statute defines "collateral sources" as "payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to":

> (1) a federal, state, or local income disability or Workers' Compensation Act; or other public program providing medical expenses, disability payments, or similar benefits;
>
> (2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments;
>
> (3) a contract or agreement of a group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services; or
>
> (4) a contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability, except benefits received from a private disability insurance policy where the premiums were wholly paid for by the plaintiff.

Minn.Stat. § 548.251, subd. 1. The collateral-source statute sets forth a procedure in which a party in a civil action may request that the district court determine and deduct "amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses." Minn.Stat. § 548.251, subd. 2.

As the majority acknowledges, the collateral-source statute only partially abrogates the common-law collateral-source rule. The enumeration of four categories of collateral sources in the statute necessarily excludes other collateral sources not listed. *See Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452, 457 (Minn. 2006) (explaining the canon of statutory construction that the expression of one thing is the exclusion of another). For example, gifts and charitable contributions are not included in the statutory definition of "collateral sources." *See* Minn.Stat. § 548.251, subd. 1. Additionally, the collateral-source statute touches only upon "payments." *Id.* When the collateral-source statute is not implicated, the common-law collateral-source rule applies. 27 Michael K. Steenson et al., *Minnesota Practice—Products Liability Law* § 13.8 (2006).

We must decide in this case whether the collateral-source statute extends to the gap between the amount billed by medical providers and the amount paid by a health insurer. Our primary goal in statutory interpretation is to give effect to the intent of the Legislature. *Auto Owners Ins. Co. v. Perry*, 749 N.W.2d 324, 326 (Minn.2008). We construe words "according to their common and approved usage." Minn.Stat. § 645.08(1) (2008). "Generally, statutes in derogation of the common law are to be strictly construed." *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 327 (Minn.2004). Under our long-established rules of statutory construction, we will not construe a statute "as altering the common law further than the language of the statute clearly and necessarily requires." *Kelly v. First Minneapolis Trust Co.*, 178 Minn. 215, 217, 226 N.W. 696, 696 (1929); *accord Do v. Am. Family Mut. Ins. Co.*, 779 N.W.2d 853, 858 (Minn.2010) (interpreting collateral-source statute).

The majority acknowledges that statutes in derogation of the common law are to be

strictly construed, yet blatantly disregards this principle of statutory interpretation and adopts an expansive interpretation of "payments"—an interpretation that goes beyond the ordinary meaning of the word "payments" as "[a]n amount paid." *The American Heritage Dictionary of the English Language* 1292 (4th ed. 2000). The majority relies on a strained construction of "payments" to reach the conclusion that "the negotiated discount was a payment because it involved the exchange of things of value to discharge Swanson's medical bill contractual obligations." [1] I would rely on the plain and ordinary meaning of the word "payments" to mean "an amount paid" and hold that a tortfeasor is not entitled to benefit from a negotiated discount of a medical bill to reduce her damages under Minnesota's collateral-source statute. [2]

But even applying the majority's strained interpretation—the word "pay-

ments" as the delivery of something valuable other than money in satisfaction of an obligation—the word "payments" does not encompass an amount *not* paid to satisfy an obligation. The only thing that Health-Partners delivered to Swanson's medical providers to satisfy Swanson's debt was $17,643. The $17,643 is the only thing that qualifies under the statute as a "payment" related to the injury in question and made on the plaintiff's behalf. *See* Minn.Stat. § 548.251, subd. 1. Treating a write-off— an amount no one has paid—as a "payment" defies both logic and common sense. As the Ohio Supreme Court has reasoned, "Because no one pays the write-off, it cannot possibly constitute *payment* of any benefit from a collateral source." *Robinson v. Bates*, 112 Ohio St.3d 17, 857 N.E.2d 1195, 1200 (2006). [3]

In any event, there is no express declaration or clear indication in Minnesota's collateral-source statute that the Legisla-

---

**1.** Although my fundamental disagreement with the majority concerns its construction of the term "payment" in a statute that modifies the common law, I also note there is no evidence in the record of a contract between HealthPartners and Regions. Consequently, the majority is left to speculate that "[i]t appears that HealthPartners and the medical providers had some type of understanding that in exchange for HealthPartners referring its policyholders to them, they would provide medical services at a discount to these policyholders."

**2.** In applying the collateral-source statute, the district court determines and then reduces the jury award by "amounts of collateral sources that have been *paid* for the benefit of the plaintiff or are otherwise available to the plaintiff." Minn.Stat. § 548.251, subd. 2 (emphasis added). The majority concedes that the negotiated discount—while supposedly a "payment" under subdivision 1—"was not 'paid' to Regions as a money tender" under subdivision 2. The majority suggests that the discount falls within the scope of the collateral-source statute because "it was 'otherwise

available' to Swanson." The majority reasons that other interpretations of "collateral sources" would render the words "otherwise available" superfluous. Simply because the words "otherwise available" have no application here does not mean that the words do not have meaning in other situations and in other contexts. The Florida Supreme Court has interpreted the words "otherwise available" in Florida's collateral-source statute to mean "those benefits that have already been paid or that are presently due and owing." *Allstate Ins. Co. v. Rudnick*, 761 So.2d 289, 293 (Fla. 2000).

**3.** The Ohio Supreme Court takes the view that "[b]oth the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care." *Robinson*, 857 N.E.2d at 1200; *accord Stanley v. Walker*, 906 N.E.2d 852, 857–58 (Ind.2009). This appeal does not involve the admissibility at trial of a negotiated discount to establish the reasonable value of medical services.

ture intended to abrogate the common-law rule in cases involving negotiated discounts secured on a plaintiff's behalf. If the Legislature had clearly intended that a plaintiff not recover the amount of a negotiated discount as part of his tort damages, the Legislature could have expressly limited recovery of medical expenses "to the amount actually paid or actually incurred by or on behalf of the claimant, whichever amount is lower," as an unsuccessful bill in a recent session of the Minnesota Legislature proposed. S.F. 1310, § 8, 86th Minn. Leg.2009. Furthermore, in previous published opinions, the court of appeals consistently concluded that negotiated discounts do not constitute "collateral sources" under the statute. *See, e.g., Tezak v. Bachke,* 698 N.W.2d 37, 41–42 (Minn.App.2005), *rev. denied* (Minn. Aug. 24, 2005); *Foust v.*

*McFarland,* 698 N.W.2d 24, 36 (Minn.App. 2005), *rev. denied* (Minn. Aug. 16, 2005).

The majority relies on the analysis of the Florida Supreme Court in *Goble v. Frohman,* 901 So.2d 830, 833 (Fla.2005), which concluded that a contractual discount fits within the Florida statute's definition of collateral sources, but it is significant that at least three of the seven justices in that case believed that limiting the plaintiff's damages to the amount actually paid was consistent with Florida's common law, *id.* at 833–34 (Bell, J., specially concurring).[4] Only one justice expressed a contrary point of view. *Id.* at 835–36 (Lewis, J., concurring). Furthermore, denying the plaintiff the benefit of a negotiated insurance discount represents a distinct minority view among state courts that have considered the issue.[5]

**4.** Other courts limiting the plaintiff's recovery to the amount actually paid have used similar reasoning. *See, e.g., Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786, 789–91 (2001) (concluding that the injured party should be limited to recovering the amount actually paid for the medical services and noting that the write-off was not "paid" by any collateral source); *Hanif v. Hous. Auth. of Yolo County,* 200 Cal.App.3d 635, 246 Cal. Rptr. 192, 194–95 (1988) (concluding that the proper measure of damages is the amount actually paid for medical services).

**5.** Employing various rationales, a majority of courts that have considered the issue have concluded that an injured plaintiff is entitled to recover the full amount of reasonable medical expenses charged, including amounts later written off. *See, e.g., Lopez v. Safeway Stores, Inc.,* 212 Ariz. 198, 129 P.3d 487, 496 (2006); *Mitchell v. Haldar,* 883 A.2d 32, 40 (Del.2005); *Hardi v. Mezzanotte,* 818 A.2d 974, 985 (D.C.2003); *Olariu v. Marrero,* 248 Ga.App. 824, 549 S.E.2d 121, 123 (2001); *Bynum v. Magno,* 106 Hawai'i 81, 101 P.3d 1149, 1160–62 (2004); *Wills v. Foster,* 229 Ill.2d 393, 323 Ill.Dec. 26, 892 N.E.2d 1018, 1030 (2008); *Bozeman v. Louisiana,* 879 So.2d 692, 705–06 (La.2004); *Scott v. Garfield,* 454 Mass. 790, 912 N.E.2d 1000, 1009 (2009); *Wal–Mart Stores, Inc. v. Frierson,* 818

So.2d 1135, 1139–40 (Miss.2002); *Brown v. Van Noy,* 879 S.W.2d 667, 676 (Mo.Ct.App. 1994); *White v. Jubitz Corp.,* 347 Or. 212, 219 P.3d 566, 580–83 (2009); *Haselden v. Davis,* 353 S.C. 481, 579 S.E.2d 293, 294–95 (2003); *Papke v. Harbert,* 738 N.W.2d 510, 535–36 (S.D.2007); *Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 322 (2000); *Koffman v. Leichtfuss,* 246 Wis.2d 31, 630 N.W.2d 201, 208–13 (2001). According to the Kentucky Supreme Court, "it is absurd to suggest that the tortfeasor should receive a benefit from a contractual arrangement" between an insurer and health care provider. *Baptist Healthcare Sys., Inc. v. Miller,* 177 S.W.3d 676, 683 (Ky. 2005). While many of these courts are following the common law collateral-source rule, "around half the states have abolished or limited the collateral source rule for specified claims," Dan B. Dobbs, *The Law of Torts* 1059 (2000). In contrast to the majority's approach here, other courts have construed collateral-source statutes narrowly to preserve the common law. *See, e.g., Jones v. Kramer,* 267 Conn. 336, 838 A.2d 170, 177–78 (2004); *Allstate Ins. Co. v. Rudnick,* 761 So.2d 289, 293 (Fla.2000); *Oden v. Chemung County Indus. Dev. Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 661 N.E.2d 142, 144 (N.Y. 1995). In "recogniz[ing] only those alterations of the common law that are clearly expressed in the language of the statute," the

The majority justifies its rejection of a narrow construction of "payments" by reasoning that a "broader" construction is "in harmony with the statute's purpose." *Maust v. Maust,* 222 Minn. 135, 139, 23 N.W.2d 537, 540 (1946) (citation omitted) (internal quotation marks omitted). But we do not consider legislative purpose when the statutory language is clear. *S.M. Hentges & Sons, Inc. v. Mensing,* 777 N.W.2d 228, 232 (Minn.2010) (citing Minn. Stat. § 645.16(1)-(4) (2008)).[6] Moreover, although the majority asserts that the Legislature clearly intended to abrogate the common-law collateral-source rule in instances of insurance coverage, in prior cases we have construed the collateral-source statute narrowly to exclude certain forms of insurance coverage—namely insurance connected to the tortfeasor. *See Do,* 779 N.W.2d at 860 (holding that "liability payments made by a tortfeasor's automobile insurer are not a collateral source for purposes of the collateral source statute"); *Dean v. Am. Family Mut. Ins. Co.,* 535 N.W.2d 342, 345 (Minn.1995) (holding that "a tortfeasor's liability insurance payment" does not trigger the collateral-source statute).

In concluding that there is no distinction between "negotiated discounts" and "money payments" in Minnesota's collateral-source statute, the majority relies on cases from other jurisdictions applying the common-law collateral-source rule to negotiated discounts. *See Lopez v. Safeway Stores, Inc.,* 212 Ariz. 198, 129 P.3d 487, 495 (2006); *Mitchell v. Haldar,* 883 A.2d 32, 40 (Del.2005); *Brown v. Van Noy,* 879 S.W.2d 667, 676 (Mo.Ct.App.1994).[7] The majority's analysis ignores the Legislature's specific use of the word "payments" in Minn.Stat. § 548.251, subd. 1, to define "collateral sources." By holding that the statute applies "in cases of benefits derived from a plaintiff's health insurance policy," the majority effectively rewrites and broadens the definition of "collateral sources" to encompass insurance *benefits,* rather than insurance *payments* as the language of the statute dictates. *Cf.* N.J. Stat. Ann. § 2A:15–97 (West 2010) (defining collateral sources as "benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor"); Or. Rev.Stat. § 31.580 (2009) (defining collateral sources in terms of "benefits" and providing that a court may not deduct from a verdict life insurance benefits; insurance benefits; retirement, disability and pension plan benefits; and federal Social Security benefits). Noting this distinction between benefits and payments,

---

Connecticut Supreme Court explained: "The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law." *Jones,* 838 A.2d at 177 (citation omitted) (internal quotation marks omitted).

**6.** We also cannot disregard "the letter of the law ... under the pretext of pursuing the spirit." Minn.Stat. § 645.16. Other courts denying the plaintiff the benefit of the negotiated discount have been more transparent in their analysis. For example, while acknowledging that a write-off "technically is not a payment from a collateral source within the meaning of [Idaho's] collateral source stat-

ute," the Idaho Supreme Court nonetheless held that a plaintiff cannot recover the amount of the write-off because "it is the type of windfall that [the statute] was designed to prevent." *Dyet v. McKinley,* 139 Idaho 526, 81 P.3d 1236, 1239 (2003) (citation omitted) (internal quotation marks omitted); *accord Kastick v. U–Haul Co. of W. Mich.,* 292 A.D.2d 797, 740 N.Y.S.2d 167, 169 (N.Y.App.Div. 2002).

**7.** Notwithstanding the majority's reliance on these cases, they all ultimately reach the opposite conclusion as the majority and hold that a plaintiff is entitled to recover the amount of a negotiated discount in a tort action. *See Lopez,* 129 P.3d at 496; *Mitchell,* 883 A.2d at 40; *Brown,* 879 S.W.2d at 676.

the Oregon Supreme Court has concluded that Medicare write-offs should not be deducted from a verdict under Oregon's collateral-source statute, reasoning that "the legislature exempted from judicial deduction Social Security 'benefits'; it did not exempt Social Security 'payments.'" *White*, 219 P.3d at 576.

In addition, the majority justifies its decision on the basis that allowing Swanson to recover the amount of the negotiated discount would compensate him "for a loss he did not suffer." This is not strictly true. While the majority suggests that the medical bills "might not be a true measure of the reasonable value of Swanson's injury," the reasonable value of the medical services was an issue for the jury. The jury found that $62,259 would "fairly and adequately compensate" Swanson for his past medical expenses. The jury's finding has not been challenged on appeal, and we are not free to second-guess that decision.

Finally, in interpreting the collateral-source statute, the majority focuses on the policy goal of preventing a so-called "double recovery" for an injured plaintiff.[8] However, the majority does not address or even mention the resulting windfall to the at-fault tortfeasor. Under the common law, we have never favored a windfall to a tortfeasor at the expense of an injured party, *see Hueper*, 314 N.W.2d at 830, and our rules of statutory construction require us to interpret the collateral-source statute consistent with the continuation of the common law absent clear language to the contrary, *Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877 (Minn. 2002). As a Louisiana court has explained,

the tortfeasor receives a windfall, because the damages the tortfeasor must pay are reduced as the result of insurance procured by the injured party:

> The argument that there is no underlying obligation for plaintiff to pay the amount of the write-offs and, therefore, the plaintiff should not be allowed to benefit from a non-existent debt, falls because the effect of this reasoning results in a diminution of the tortfeasor's liability *vis-à-vis* an insured victim when compared with the same tortfeasor's liability *vis-à-vis* an *uninsured* victim. Assuming the injury is the same, a tortfeasor's liability to both, an insured and uninsured victim, should be the same: the full extent of the medical bills incurred.

*Griffin v. La. Sheriff's Auto Risk Ass'n*, 802 So.2d 691, 715 (La.Ct.App.2001); *accord White*, 219 P.3d at 583 (explaining that excluding write-offs from a plaintiff's recovery "creates the anomaly" that a tortfeasor may have more limited liability if the injured person is insured). In other words, the liability of similarly situated defendants should not depend "on the relative fortuity of the manner in which each plaintiff's medical expenses are financed." *Leitinger v. DBart, Inc.*, 302 Wis.2d 110, 736 N.W.2d 1, 10 (2007).

Accordingly, I would construe the collateral-source statute narrowly in favor of the continuation of the common law and in accordance with the plain and ordinary meaning of the word "payments." I would hold that "payments" in the collateral-source statute does not extend to a negotiated discount between an insurance com-

---

8. In discussing negotiated discount amounts, the Virginia Supreme Court has noted that the "amounts written off are as much of a benefit for which [the injured party] paid consideration as are the actual cash payments made by his health insurance carrier to the

health care providers." *Acuar v. Letourneau*, 260 Va. 180, 531 S.E.2d 316, 323 (2000) (explaining that "[t]he wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation").

pany and medical providers. This result ensures that the benefit of the negotiated discount inures to the injured party—the party that procured the insurance coverage—not the tortfeasor who caused the injury.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.

DIETZEN, Justice (concurring).

I agree with the result reached by the majority, but disagree with its underlying analysis. At issue is whether a negotiated discount obtained by a plaintiff's health insurer is a "collateral source" as defined by Minn.Stat. § 548.251, subd. 1 (2008), of the collateral-source statute. In my view, this case presents a straightforward question of statutory construction.

Minnesota Statutes § 548.251, subdivision 1, provides that collateral sources are "payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict," pursuant to "(2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage." Subdivision 2, which sets forth the procedure for determining "collateral sources," is also relevant. It provides that if a motion is filed, the court shall determine the "amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses." Minn.Stat. § 548.251, subd. 2(1) (2008).

The majority concludes, and I agree, that the statute unambiguously provides that negotiated-discount amounts a plaintiff is billed by a medical provider but does not pay because the plaintiff's insurance provider negotiated a discount on plaintiff's behalf are "collateral sources" under Minn.Stat. § 548.251. This conclusion is based on the plain and ordinary meaning of payments as set forth in subdivision 1 and the explanatory provision of subdivision 2 that collateral sources include amounts "otherwise available to the plaintiff." Because the statute is unambiguous, it is neither necessary nor appropriate to go beyond the words of the statute to determine the purpose of the law. *See* Minn.Stat. § 645.16 (2008); *Toth v. Arason,* 722 N.W.2d 437, 441–42 (Minn.2006); *Peterson v. Halvorson,* 200 Minn. 253, 256, 273 N.W. 812, 813 (1937) (concluding that when the statute is "too plain to admit of any other view" the court is without power to change the plain language of the statute (citation omitted) (internal quotation marks omitted)); *cf. Simon v. Milwaukee Auto. Mut. Ins. Co.,* 262 Minn. 378, 385, 115 N.W.2d 40, 45 (1962) (concluding that when an "insurance contract is unambiguous, the language used must be given its ordinary and usual meaning," and the court may not "redraft an insurance contract under the guise of strict construction to reach a result that [the court] would prefer"). Consequently, the history of the common-law collateral-source rule, and case law from other jurisdictions are not necessary. In my view, the majority's consideration of these matters constitutes dicta.